Larry Gene BELL, Petitioner–Appellant,

v.

Parker EVATT, Commissioner, South Carolina Department of Corrections; T. Travis Medlock, Attorney General, State of South Carolina, Respondents–Appellees.

No. 94–4016.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 25, 1995.

Decided Dec. 18, 1995.

**ARGUED:** Stephen G. Morrison, Columbia, South Carolina, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, Lauri J. Soles, Assistant Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Elizabeth Scott Moise, Daniel J. Westbrook, Columbia, South Carolina; John D. Delgado, Columbia, South Carolina; John H. Blume, Post–Conviction Defender Organization of South Carolina, Columbia, South Carolina, for Appellant.

Before RUSSELL, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge MICHAEL and Judge MOTZ joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

Larry Gene Bell, awaiting execution in South Carolina for kidnapping and brutally murdering Sharon Faye Smith, appeals the district court's denial of his final petition for writ of habeas corpus. The question before this Court, is whether any of Bell's numerous "eleventh-hour" complaints warrant habeas relief. The district court concluded that Bell's challenges to his conviction and death sentence were meritless. We affirm.

### I.

On Friday, May 31, 1985, at approximately 3:15 p.m., while most of her friends and classmates were packing for their high school graduation trip, seventeen-year-old Sharon Faye Smith ("Shari") was abducted from the driveway of her Lexington County, South Carolina home. Discovering Shari's car— unattended and still running—Shari's father started searching for her. When his efforts failed, Mr. Smith contacted the police. State officials and local F.B.I. agents soon initiated a massive manhunt for Shari, which lasted until her body was found on June 5, 1985.

While Shari was still missing, someone identifying himself as Shari's abductor made the first in a series of harassing phone calls to the Smiths. Because the caller knew de-

tails that would have been known to only Shari or her kidnapper, the Smiths made notes of the calls. Authorities eventually traced and recorded all later calls. During the first conversation, the abductor told Shari's family they would be receiving a letter from Shari. State officials intercepted her letter, entitled "Last Will and Testament," from the mail. Apparently, her abductor had Shari draft it shortly before her death. On June 5, 1985 the caller—later identified as Bell—provided directions leading to Shari's body. Unfortunately, by the time Shari's body was located, the pathologist could not ascertain either the cause of her death or whether or not she had been sexually assaulted. The pathologist believed, however, that Shari either suffocated or died from dehydration (resulting from a rare form of diabetes from which Shari suffered).

Following the discovery of Shari's body, Bell made harassing phone calls to the Smiths for the next three weeks. During these calls, Bell callously depicted how he abducted Shari at gun point, raped and sodomized her, wrapped her head in duct tape, and suffocated her. He even malevolently discussed Shari's funeral arrangements with Shari's sister. In one call, Bell identified the location of the body of ten-year-old Debra May Helmick, a little girl he kidnapped exactly two weeks after he kidnapped Shari.[1]

Authorities finally arrested Bell on June 27, 1985. They tracked him down through an anonymous tip[2] and by raising a telephone number imprinted on the paper on which Shari wrote her "Last Will & Testament." Evidence later found in his parent's home and in the house where Bell was housesitting confirmed Bell's involvement in Shari's disappearance and murder.

In February 1986, Larry Gene Bell was convicted of murdering and kidnapping Shari. The jury recommended the death sentence and the trial judge imposed the sentence in accordance with the jury's find-

ings. Bell's conviction and sentence were affirmed by the South Carolina Supreme Court. *State v. Bell,* 293 S.C. 391, 360 S.E.2d 706 (1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988). A petition for rehearing was denied on September 15, 1987. Bell's later petition for writ of certiorari in the United States Supreme Court was also denied. *Bell v. South Carolina,* 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988).

On March 4, 1988, Bell filed an application for post-conviction relief ("PCR") in South Carolina State Court.[3] The court held two hearings on the matter after respondents filed a return to Bell's PCR application. On August 22, 1991, the PCR court dismissed the application, but on September 9th the PCR court permitted a motion to alter or amend judgment and heard arguments on November 20th. The order denying the motion was issued January 18, 1992. Bell appealed his PCR application to the South Carolina Supreme Court, which denied his request in November 1992. Bell subsequently filed a second petition for writ of certiorari in the Supreme Court of the United States. This second petition was denied. *Bell v. South Carolina,* 507 U.S. 1022, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993).

Having exhausted all state relief, Bell initiated this petition for a writ of habeas corpus, citing the numerous grounds for relief detailed below. In September 1993, the State filed a return and motion for summary judgment, contending Bell's requests for relief did not entitle him to habeas relief. In December 1993, following two extensions to respond to the State's motion for summary judgment, Bell filed his response, in which he argued additional details in support of his many claims.[4]

Bell filed a motion for an evidentiary hearing on his petition for writ of habeas corpus on May 25, 1994. The magistrate judge de-

---

1. Bell is currently serving a death sentence for the kidnapping and murder of Debra Helmick; however, Bell has not appealed that sentence in this habeas action.

2. Police later identified Bell as one of the callers whose tips led to his own arrest.

3. Bell subsequently filed two amended applications for post-conviction relief.

4. The Magistrate Judge's Report and Recommendation contains a detailed account of both the evidence introduced during Bell's trial and the circumstances surrounding the trial.

nied Bell's motion in his Report and Recommendation. The magistrate judge subsequently recommended granting the State's motion for summary judgment. Bell filed objections to the Report and Recommendation.

■ Citing *Townsend v. Sain,*[5] the United States District Court for the District of South Carolina supported the magistrate judge's denial of Bell's motion for an evidentiary hearing. The district court found that Bell had simply reargued the same issues that he had made before the magistrate judge, and it concluded that Bell's objections to the magistrate judge's analysis of the grounds upon which Bell claims relief were meritless.

## II.

■ We turn first to Bell's ineffective assistance of counsel claim. Bell contends that he was denied his right to effective assistance of counsel when, during the guilt phase of his trial, his trial counsel conceded his guilt to the kidnapping charge and pursued a verdict of guilty but mentally ill ("GBMI") for both the murder and the kidnapping charge. Bell argues that he was prejudiced because his trial counsel ignored Bell's plea of not guilty.

■ To prove that he was deprived of his Sixth Amendment right to effective assistance of counsel, Bell must show that (1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688 & 694, 104 S.Ct. 2052, 2064–65 & 2068, 80 L.Ed.2d 674 (1984). We shall review the reasonableness of trial counsel's performance under the first prong of *Strickland.*

■ This court defines effective assistance of counsel as that which is "within the range of competence demanded of attorneys in criminal cases." *Marzullo v. Maryland,* 561 F.2d 540, 543 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (citing *McMann v. Richardson,* 397 U.S. 759, 770–71, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970)). And when reviewing counsel's performance under *Strickland,* this court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. To prevail, therefore, Bell "must overcome the presumption that under the circumstances, the challenged actions might be considered sound trial strategy." *Id.*

According to the record, Bell's retained trial counsel—a well-known and experienced defense attorney from South Carolina—spent the seven months before trial extensively investigating the facts of the case and formulating a trial strategy. In light of the overwhelming evidence against Bell,[6] trial counsel and Bell agreed to pursue a GBMI verdict. Trial counsel's PCR testimony reveals that the defense team, which included Bell, reasoned that pursuing a GBMI plea was consis-

---

5. A federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: if (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state court's factual determination was not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there was a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963).

6. The State's case against Bell was devastating. First, the State had copies of the taped telephone conversations Bell had with the Smith family, in which he depicts sexually assaulting and sodomizing Shari and wrapping duct tape around her head. Several witnesses identified Larry Bell as the caller. Second, the paper on which Shari wrote her "Last Will and Testament" contained imprints of a telephone number that eventually led authorities to the residence where Bell was housesitting during the time of the crimes. Third, additional evidence found at the home of Bell's parents further solidified his involvement in the crime. Fourth, a witness identified Bell as the man she had seen near the Smith house around the time of Shari's abduction. Finally, after Bell was arrested, he made statements linking himself to the murder.

tent with Bell's testimony and behavior.[7] Furthermore, they feared that denying all involvement in this heinous crime, given the abundant evidence against him, would inflame the jury and incite it to render the death sentence. They reasoned that pursuing the lesser verdict of GBMI would dramatically reduce Bell's chances of receiving a death sentence.

It was important for the defense to retain some credibility so that the jury would be sympathetic to the defense witnesses testifying that Bell deserved mercy. Thus, as the state trial court expressly found the decision to pursue a GBMI verdict was a strategic one that Bell and his trial counsel "agreed to"; it was made after consulting with other lawyers, mental health experts, investigators, and Bell's family. All indications lead us to conclude that the decision to concede his guilt was a rational one, formulated after a thorough examination of every viable option and obstacle.

Bell alleges, however, that his trial counsel's concessions of guilt during closing argument prejudiced his case and violated his right to plead not guilty. As one example of how trial counsel's concessions of guilt to the kidnapping inferred guilt to both offenses, Bell cites the following passage from his trial counsel's closing arguments:

Now, there has been a lot of talk here about what the defense is going to say. I will tell you what I am going to say. I am going to do something that probably hasn't been done before, pretty novel way to approach your final argument when you are representing your client, but I am not here to insult your intelligence. I am not here to make you think that [defense counsel] is trying to blow smoke at you. I will tell you right now that the State has proved beyond a reasonable doubt that Larry Gene Bell is guilty of kidnapping. That is his lawyer talking to you. That is his lawyer telling you what the State has proved or not proved. We haven't come in here and tried to create any kind of illusion. We haven't come in here and tried to create any evidence, blow smoke in your

face so that you don't see the truth. During this trial think about how much I tested the allegations made by the State of South Carolina. Did we really contest the guilt of the kidnapping? We contested a witness' identification, we contested identification of the car, because Mr. Bell believes that was not him. And for that purpose we contested it. And the fact of the matter is ladies and gentlemen, they got the right guy, they got Mr. Bell for the abduction. . . .

Bell's excising this particular passage from trial counsel's entire closing argument (and the entire trial) misrepresents the totality of trial counsel's defense. After these remarks, trial counsel emphasized that, although it was Bell's voice on the telephone recordings, that fact did not conclusively prove that Bell murdered Shari. Bell's trial counsel argued:

The tapes suggest that he gave Miss Smith this awful alternative, but Dr. Sexton and the other witnesses for the state have really never proved how Miss Smith died. Was Mr. Bell's revelations on that tape the result of what really happened? Or was it the ravings of a lunatic who is out of his mind, who didn't know what was happening? I don't know. Nobody from the state knows either. That is why you were given an alternative of whether [Shari's death] was by suffocation. or dehydration. . . . And you will have to use your good common sense and go back and find out and determine and figure out whether or not the state has proved guilt beyond a reasonable doubt as to the homicide. . . .

By conceding Bell's guilt to the kidnapping, trial counsel attempted to down-play the inference that Bell was also guilty of murder and, instead, tried to promote the conclusion that Bell was mentally ill. Trial counsel frequently reminded the jury of the abundance of psychiatric testimony they had heard and witnessed first-hand in Bell's own behavior during trial. Trial counsel was obviously attempting to persuade the jury to pity a man in Bell's mental condition.

---

7. Trial counsel felt that if Bell testified in his loose dissociated way, the jury would conclude

from their first-hand observations that Bell was mentally ill.

Bell fails to acknowledge that his trial counsel confronted a difficult situation. The State had overwhelming evidence of Bell's involvement in the kidnapping, and the State's theory of the case was that Bell contrived his mental illness for the sole purpose of evading the death penalty and receiving a lighter sentence. Bell even testified that feigning mental illness was a common practice known to him, and that manipulating doctors "can save a person from the electric chair." Additionally, Bell admitted on cross-examination that he had previously fabricated stories of blackouts and visions simply to avoid harsher penalties. Trial counsel's strategy, to which Bell consented, was undoubtedly targeted toward saving Bell from a death sentence. We emphasize, therefore, that neither Bell nor any other aggrieved defendant can manipulate this forum to construe a reasonable, but ultimately unsuccessful strategy in his favor. Standing alone, unsuccessful trial tactics neither constitute prejudice nor definitively prove ineffective assistance of counsel.

The Supreme Court has recognized that strategies devised after extensively investigating the law and facts relevant to any and all probable options are virtually unchallengeable. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66. A reviewing court may not permit the benefit of hindsight to impact its review. *Id.* at 689, 104 S.Ct. at 2065; *see Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). To succeed in his ineffective assistance of counsel claim, Bell must overcome the presumption that the challenged action may be considered an appropriate and necessary trial strategy under the circumstances. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

We have previously distinguished statements that amount to mere tactical retreats from those that parlay a complete surrender. *See Clozza v. Murray,* 913 F.2d 1092, 1099 (4th Cir.1990). Some remarks of complete concession may constitute ineffective assistance of counsel, but tactical retreats may be reasonable and necessary within the context of the entire trial, particularly when there is overwhelming evidence of the defendant's guilt. *Id.* at 1099–1100.

Trial counsel's remarks constituted tactical retreats. Conceding Bell's guilt on the kidnapping charge did not preclude Bell from maintaining his innocence on the murder charge. Furthermore, a GBMI verdict would have increased Bell's chances of receiving a life sentence rather than a death sentence. In light of the evidence against Bell, trial counsel's actions were realistic: Bell's alibi was flawed; Bell had been identified as the man who had repeatedly called Shari's family; the State had an abundance of forensic evidence identifying Bell as the perpetrator; and Bell made incriminating statements to the police after his arrest. Given the situation at hand, the defense had few alternatives.

Trial counsel urged the jury to reject the State's evidence and find his client GBMI under South Carolina law. As the state PCR judge recognized, trial counsel feared he would lose credibility with the jurors at the trial's sentencing phase if he tried to convince them during the guilt phase that Bell was innocent. In a federal habeas corpus proceeding, we presume that the state court findings are correct. 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Roach v. Martin,* 757 F.2d 1463 (4th Cir.1985). Trial counsel's pursuit of a GBMI verdict conformed to a reasonable pattern of trial strategy and advocacy by one familiar with the intricacies of a death penalty case and the impact psychiatric testimony has on those cases. Because this was a reasonable and consented to strategy, there was not, in the total context of Bell's trial, deficient performance by counsel. *See Berry v. King,* 765 F.2d 451 (5th Cir. 1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986).

We are not holding that a defendant's consent to trial strategy in itself, vitiates all claims of ineffective assistance of counsel. Rather, we recognize consent as probative of the reasonableness of the chosen strategy and of trial counsel's performance. We conclude that Bell has failed to rebut *Strickland*'s presumption that counsel's conduct fell within the range of reasonable trial

strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

Bell's trial counsel was an experienced defense lawyer in South Carolina, he employed psychiatric experts on Bell's behalf and his efforts indicate he zealously represented Bell. Trial counsel's pursuit of a GBMI verdict was integral to a trial scheme to avoid a death sentence where evidence of guilt of a gruesome murder was overwhelming and legitimate factual defenses were non-existent for Bell. Trial counsel confronted the difficult reality that the jury would undoubtedly determine Bell abducted and murdered Shari Smith, heinous acts exacerbated by the emotional torture he inflicted upon Shari and her family. Clearly, trial counsel's representation fell within the bounds of objective standards of reasonableness.

Because we have found that trial counsel's actions were reasonable, we need not evaluate trial counsel's actions under the second prong of *Strickland.*

### III.

■ We next turn to Bell's due process claim. Bell argues that he was denied due process under *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), because his trial counsel's repeated concessions of Bell's guilt to the kidnapping, essentially waived Bell's right to plead not guilty without an on-the-record showing the waiver was made knowingly and voluntarily. Despite the fact that *Boykin* requires affirmatively showing that a guilty plea was made knowingly and voluntarily, *Boykin,* 395 U.S. at 242–44, 89 S.Ct. at 1711–13; Bell insists he was entitled to an "on-the-record" showing that he and his trial counsel agreed to a trial strategy conceding guilt.

■ Due process does not require such an on-the-record showing. In *Boykin,* the Court emphasized that a guilty plea entered by the accused is more than a confession which admits that the defendant committed various criminal acts; a guilty plea, in essence, constitutes a conviction, and it relieves the prosecution of its burden of proving its case. *Id.:* at 242, 89 S.Ct. at 1711–12. Because a guilty plea is a self-imposed verdict,

the trial court must ensure the accused made a knowing and voluntary waiver of his constitutional right against self-incrimination and his right to confront one's accusers. *Id.* at 243, 89 S.Ct. at 1712. *Boykin*'s concerns and safeguards, however, do not apply to Bell because Bell did not enter a guilty plea. His consent to a trial strategy in which he admitted some of his guilt did not foreclose the jury from finding him not guilty on either count, nor did it relieve the State from the burden of proving its case. Bell was provided a fair jury trial, one in which he confronted his accusers and took the stand on his own behalf. An informed and impartial jury ultimately determined his guilt.

We therefore reject Bell's due process claim because Bell had no constitutional right to a contemporaneous, on-the-record inquiry of whether he consented to trial counsel's strategic decisions.

### IV.

■ Next, Bell contends that the court-appointed competency examiners were partisan agents of the State, and, therefore, he was denied his right to due process and effective assistance of counsel.

Bell cites *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in an attempt to expand the parameters of procedural due process competency hearings, so that they be conducted by neutral, independent examiners. We do not believe that *Ake* is applicable in this instance as the facts in *Ake* are distinguishable from Bell's case.

Unlike Bell, Ake was indigent and was refused a state-funded psychiatric examination that would have aided his defense in establishing Ake was mentally ill at the time he committed the offense he was charged with. The Supreme Court reversed Ake's death sentence on the ground that he was denied such an examination. The Court held that where an indigent defendant's sanity is at issue, the state must provide funds for the defendant to obtain an independent examiner to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096.

*Ake* established a due process right to a mandatory competency hearing *when the defendant is indigent* and an examination is necessary to determine the defendant's criminal responsibility *at the time of the crime.* In sharp contrast, Bell was neither indigent, nor unable to hire his own mental experts. Furthermore, Bell's examination differed from Ake's, in that Bell's examinations determined his *competency to stand trial. See Pate v. Robinson,* 383 U.S. 375, 384–86, 86 S.Ct. 836, 841–43, 15 L.Ed.2d 815 (1966).

It is established that a criminal defendant must be competent to stand trial. *Medina v. California,* 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992). In the case at hand, Bell underwent three competency hearings throughout the course of his trial and each time the trial judge found him competent to proceed. During Bell's hearings,[8] Bell was evaluated by both Dr. Dunlap (a consultant to the state hospital, appointed by the trial court in accordance with the S.C.Code Ann. § 44–23–410), as well as by several experts Bell hired to assist in the preparation of his defense.

After each of the hearings, the trial court made specific findings on the record that Bell was competent to stand trial. The findings included the testimony of both the state experts and Bell's experts, as well as the court's observations of Bell before, during, and after the hearings. Furthermore, the state PCR judge made specific findings that Dr. Dunlap was neutral and impartial. These findings are entitled to a presumption

of correctness.[9] *Sumner,* 449 U.S. at 547–550, 101 S.Ct. at 769–71. And Bell fails to satisfy his burden of establishing by convincing evidence that these findings are erroneous. *See* 28 U.S.C. § 2254(d). Accordingly, we conclude, Bell was neither denied his constitutional right of due process nor his constitutional right of effective assistance of counsel.

## V.

Bell further maintains that the trial judge's findings of competency were unsupported by the record as a whole. We disagree.

As the district court noted, findings of fact made by a state court in PCR proceedings enjoy a presumption of correctness,[10] *see Sumner,* 449 U.S. at 550, 101 S.Ct. at 770–71, and questions of a defendant's competency are entitled to the same presumption, *see Adams v. Aiken,* 965 F.2d 1306, 1313 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2966, 125 L.Ed.2d 666 (1993). To overcome this presumption, Bell must show by convincing evidence that the findings of the state court were erroneous. *See Sumner,* 449 U.S. at 550, 101 S.Ct. at 770–71. The standard for evaluating competency is whether the defendant understands the nature and object of the proceedings against him, and is able to consult with his counsel and assist in the preparation of his defense. *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975); *Pate,* 383 U.S. at 375, 86 S.Ct. at 836;

8. The first hearing was held before trial started. On two other occasions during the trial, the proceedings were stopped to further evaluate Bell's competency. Both of these hearings were requested by Bell's attorney, who indicated that Bell was becoming difficult to control and was not cooperating in the defense effort. After each exam, the trial judge made specific findings of fact on the record concluding that Bell was competent to stand trial.

9. The issue of Bell's competency was again raised in the state court proceeding on Bell's PCR application. The PCR court found Bell mentally competent throughout his trial. Like the trial judge's findings of fact, this finding is also entitled to presumption of correctness. *See, Sumner,* 449 U.S. at 550, 101 S.Ct. at 770–71; *Roach v. Martin,* 757 F.2d 1463 (4th Cir.1985).

10. The eight exceptions to the presumption of correctness for findings of fact are:

(1) that the merits were not resolved;
(2) that the state court's fact-finding procedure was inadequate;
(3) that the material facts were not developed;
(4) that the state court lacked jurisdiction;
(5) that petitioner lacked counsel;
(6) that petitioner was not given a "full, fair, or adequate hearing" on the competency issue;
(7) that he was otherwise denied due process; and
(8) that the factual determinations of the trial judge were unsupported by the record.

28 U.S.C. § 2254(d). Bell does not meet any of these exceptions.

*Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Despite the fact that the district court determined that the trial judge properly concluded that Bell was competent, Bell insists that the trial judge (1) misapplied the competency standard, and (2) ignored Bell's trial counsel's statements that Bell was neither cooperating nor communicating with him. We reject both of Bell's arguments.

The trial judge held three competency hearings. The first hearing was held before trial. The second hearing, was held specifically at trial counsel's request; and the third was held during the penalty phase. At each hearing, the trial judge was only required to ensure that Bell had the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel. *Drope*, 420 U.S. at 171, 95 S.Ct. at 903–04. The trial judge was not required to police whether Bell was acting in accordance with his capacity. Bell has failed to rebut the presumptions of correctness accorded the trial judge's findings. We therefore hold that Bell has failed to establish a due process violation.

## VI.

We next turn to Bell's claim that his Sixth Amendment right to be present during his trial was violated by his ejection from the courtroom during a portion of his trial counsel's closing argument at the guilt phase. Bell makes the innovative argument that despite the fact that his own insolence forced the trial judge to eject him from the courtroom, he had a constitutional right to an audio hook-up from the courtroom to his holding cell.

The Sixth Amendment guarantees a defendant's right to be present in the courtroom during the trial of his case. *See Lewis v. United States*, 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892). But, there are recognized limitations to this right. "A defendant can lose his right to be present at trial if, after he has been warned by the trial judge that he will be removed if he continues his disruptive behavior, he nevertheless insists upon conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970).

Bell was properly removed from the courtroom under *Allen*. The record reflects both Bell's continuous interruptions of his own counsel during closing argument and the numerous warnings the trial judge gave Bell regarding his behavior.[11] When the trial judge warned Bell he would be removed from the courtroom if he continued his antics, Bell disregarded the trial judge and refused to remain quiet.

We have never held, nor does *Allen* require that a defendant who has been removed from the courtroom because of his disruptive behavior has a right to an audio hook-up. We see no reason to create such a right. The right to be present at one's own trial serves two purposes: it gives the defendant an opportunity to face his accusers and it affords him the opportunity to help in his own defense. Bell both faced his accusers and helped in his own defense; his missing only a portion of his trial counsel's closing arguments without an audio hook-up did not interfere with his ability to do either. The trial judge's refusal, therefore, to provide the requested audio hook-up did not violate Bell's Sixth Amendment right to be present during his trial.

## VII.

Bell also contends that the trial judge abused his discretion by preventing ingress and egress to the courtroom during witness testimony. The Sixth Amendment provides that an individual accused of a criminal offense has the right to a public trial. *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Bell

11. Both Petitioner's brief and Respondent's brief cite numerous exchanges between the trial judge and Bell regarding Bell's behavior. The trial judge responded to Bell's refusal to curtail his antics in the only sensible manner, removal from the courtroom.

asserts the trial judge's restrictions amounted to partial closure.

■ Although there is a strong presumption in favor of openness, the right to an open trial is not absolute. The trial judge may impose reasonable limitations on access to a trial in the interest of the fair administration of justice. *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 n. 10, 104 S.Ct. 819, 824 n. 10, 78 L.Ed.2d 629 (1984); *see Richmond Newspapers,* 448 U.S. at 581–82, n. 18, 100 S.Ct. at 2830, n. 18 (holding that the right of access to a trial may be curtailed where there are sufficiently powerful countervailing considerations). We have held however, that a defendant's right to a public trial is not implicated by temporary limitation of ingress and egress to the courtroom to prevent disturbance of the proceedings. *Snyder v. Coiner,* 510 F.2d 224 (4th Cir. 1975).

In the instant case, the trial judge was merely maintaining order in his courtroom and ensuring a non-disruptive atmosphere for jury members, the litigants, the members of the press, and any members of the public who chose to attend. The trial judge neither ordered anyone to leave the courtroom nor closed any portion of the trial from the public altogether. Furthermore, the record does not reveal that anyone interested in the case was excluded from the courtroom. We conclude that Bell's right to an open and public trial was not violated, and that the trial judge exercised the discretion afforded him to preserve order in his courtroom and ensure that justice was unobstructed.

### VIII.

■ Bell also insists he was denied his right to a proper trial conducted in conformity with the Sixth, Eighth, and Fourteenth Amendments because the trial judge did not issue a clarifying instruction following the State's closing argument during the guilt phase when the State stressed Bell was feigning his mental illness so as to receive a lighter sentence. Bell maintains that the trial judge allowed the State to mischaracterize the GBMI verdict as a means of escaping punishment.

Following the State's closing argument during the guilt phase, trial counsel sought curative instructions for the State's recapitulation of Bell's testimony that a GBMI could "save a person from the electric chair" and for the State's remark that a "trophy" or "reward" for Bell in light of his testimony and the psychiatric evidence presented. Trial counsel specifically requested that the jury instruction read:

> I charge you that if your verdict be guilty as to murder or guilty but mentally ill as to murder, then the trial shall proceed so that the jury may determine punishment. The finding of either verdict still allows the jury to consider a sentence of life imprisonment or death.
>
> Should you find the defendant guilty but mentally ill, then the sentence imposed will be carried out after the defendant receives treatment at a facility to be designated by the Department of Corrections, and the staff of said facility gives an opinion that the defendant can be returned to the Department of Corrections so that the sentence may be carried out.

The trial judge, initially, indicated that he would give the first paragraph of this instruction, but he later refused the entire request, reasoning that the jury should not be concerned with possible penalties at the guilt phase of trial. Bell argues that the trial judge should have issued clarifying instructions regarding the State's final argument that Bell was evading punishment by seeking a GBMI verdict.

The South Carolina Supreme Court, however, has held that "information as to penalty is of no aid to the jury in determining whether the defendant committed the crime charged." *Bell,* 360 S.E.2d at 710 (citing *South Carolina v. Brooks,* 271 S.C. 355, 247 S.E.2d 436 (1978)). But Bell believes that *Simmons v. South Carolina,* prohibits counsel from presenting the jury with a "false choice" in its sentencing options. *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). We find however, that *Simmons* does not alter the holding in *South Carolina v. Brooks.*

In *Simmons,* the petitioner challenged the trial court's refusal to inform the jury during

the penalty phase of the trial that, under state law, the petitioner would be ineligible for parole should the jury decide to impose a life sentence rather than the death penalty. The Supreme Court held that the trial court's failure to so instruct the jury violated Simmons' due process rights because the state "conceal[ed] from the sentencing jury the true meaning of its non-capital sentencing alternative, namely that life imprisonment meant life without parole." *Id.* at ——, 114 S.Ct. at 2193. In *Simmons,* however, the trial court failed to give an instruction dealing with penalty at the penalty phase of the trial. In Bell's case, the trial court failed to give an instruction dealing with penalty at the guilt phase of the trial.

Moreover, here unlike *Simmons,* the trial judge corrected any misleading impression that the State's argument may have given to the jury. During jury instructions in the guilt/innocence phase, the trial judge informed the jury that "[t]here is another verdict in this case and that is not a defense. It is guilty, but mentally ill. As I said, that is not a defense, like not guilty by reason of insanity. Rather, it is a form of guilty verdict." The jury was also instructed before deliberations in the guilt/innocence phase that it "was concerned only with the question of guilty or innocence. Your sole attention is to be focused on that determination and your decision is to be made completely aside from any consideration relative to punishment." There is an "almost invariable assumption of the law that jurors follow their instructions." *Shannon,* —— U.S. at ——, 114 S.Ct. at 2427 (quoting *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). The trial judge's instructions to the jury that a GBMI verdict was a form of guilty verdict, in addition to his admonition that the jury should only concern itself with the verdict rather than the sentence, sufficiently dispelled any confusion that the Solicitor may have caused and did not present the jurors with a "false choice" in their verdict.

We conclude for these two reasons that the State's argument did not deprive Bell of his Sixth, Eighth, and Fourteenth Amendment rights.

## IX.

Bell next argues that the trial judge improperly denied a motion for mistrial after the trial judge made comments in the jury's presence suggesting he disbelieved Bell's defense. Bell asserts that the trial judge's comments denied him his right to a fair and impartial trial under the Sixth, Eighth, and Fourteenth Amendments. On review of state proceedings, the question is whether the trial judge's involvement rendered the trial fundamentally unfair. *Gaskins v. McKellar,* 916 F.2d 941, 948 (4th Cir.1990), *cert. denied,* 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).

Throughout his testimony, Bell frequently rambled giving nonresponsive answers. His behavior prompted the trial judge to intervene and instruct Bell to answer in a lucid manner. Bell charges that the trial judge's intervention detrimentally affected the jury's impartiality. Bell cites the following remark as the most egregious example demonstrating his belief that the trial judge improperly commented on the validity of Bell's mental state. The trial judge said: *"Mr. Bell, I am telling you. I know, Mr. Bell, that you understand the question."* This remark was made, however, after Bell had repeatedly not answered the questions posed to him. We find that the trial judge's comment did not render Bell's trial fundamentally unfair. As this court articulated in *Gaskins,* a trial judge's comments should not be reviewed in isolation but in the context of the whole trial. *Id.* When examined under this standard, it is evident that the trial judge was simply maintaining order in his courtroom and keeping the proceedings moving along. Furthermore, the trial judge, aware of how his comment could potentially be misconstrued, gave the following curative instruction:

Ladies and gentlemen of the jury panel, in addressing Mr. Bell I stated Mr. Bell, you understand the question. By that no juror should draw the inference that in any way I am commenting on the facts. That was not a comment or statement or opinion by me in regard to Mr. Bell's mental capacity to understand anything at all. Those matters are solely left up to you ladies and

gentlemen of the jury panel. I ask you please disregard [sic] that remark I made as being inadvertent and not an expression of opinion. Just simply my manner of addressing Mr. Bell in that particular. So disregard it.

On the evidence of record, this instruction clearly corrected any bias or prejudice the jury might have inferred from the trial judge's remark.

▊ A trial judge is vested with broad discretion to control the taking of testimony, and in recognizing the trial judge's efforts to do so, we conclude that the trial judge's remark did not prejudice Bell nor render Bell's trial fundamentally unfair. The remark was not noteworthy in the context of the entire trial and was neutralized by the trial judge's subsequent curative instruction.

### X.

▊ Bell further argues that his sentence should be reversed on the grounds of ineffective assistance of counsel because he feels that his trial counsel failed to present, during both the guilt and sentencing phases, evidence of Bell's dysfunctional family and history of chronic psychosis.

We need not go into the alleged details of his childhood that have surfaced only after Bell's conviction. The record clearly demonstrates that Bell's trial counsel did, in fact, exhaustively investigate Bell's personal history. With this information, Bell's trial counsel consulted with Bell and together they made knowing and informed decisions on how to proceed at trial. Bell's trial counsel testified during the PCR hearing that they consciously chose to portray Bell's mental illness by focusing on his increased mental disturbance during his adult life. Therefore, Bell's contention that his trial counsel prejudiced his defense by failing to present evidence regarding his childhood is unfounded. This failure to introduce evidence regarding Bell's family history was simply a strategic decision made with Bell's consent. *See Berry v. King,* 765 F.2d 451 (5th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986).

We therefore conclude that Bell's trial counsel was not ineffective and that Bell's Sixth Amendment rights were not violated.

### XI.

We next turn to Bell's argument that the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by failing to give certain jury instructions. First, Bell contends that the jury, during both the guilt phases and the sentencing phases of the trial, was confused as to the difference between the verdicts of guilty and GBMI. Second, Bell argues that the trial judge failed to instruct the sentencing jury that Bell did not have to establish mitigating factors by a preponderance of the evidence. Finally, Bell asserts that the trial judge failed to instruct the sentencing jury that it could not consider Bell's mental illness as a factor in aggravation of punishment. We find Bell's claims meritless.

▊ No evidence in the record supports Bell's conjecture that the jury was confused as to the difference between the verdicts of guilty and GBMI during either the guilt phase or the sentencing phase of his trial. Simply because the jury rejected the GBMI defense and rendered a guilty verdict during the guilt phase does not mean that the sentencing jury failed to reconsider Bell's mental illness when they rendered his death sentence. The jury has the duty to decide what weight to give to the evidence adduced at trial. *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In the instant case, both the magistrate judge and the district court found that the jury charge was proper in all respects, and that the trial judge properly instructed the jury as to the applicable South Carolina law at each juncture of the trial. There is no indication that the jury failed to follow the trial court's instructions at both phases. *See Richardson v. Marsh,* 481 U.S. 200, 206–07, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987) (holding that it is invariably assumed that jurors follow their instructions).

▊ Next, Bell contends that the trial judge's failure to clarify to the sentencing jury that Bell's burden of establishing statutory mitigating factors by a preponderance of the evidence during the guilt phase differed from his burden of establishing statutory

mitigating factors during the penalty phase. We find Bell's argument meritless. There is no constitutional requirement that a trial court instruct the jury specifically that the defendant does not bear the burden of proving mitigating circumstances. In the instant case, the trial judge stated that the jury could consider "whether the defendant has proven by *any* evidence the existence of mitigating circumstances." Furthermore, after citing three specific examples of statutory mitigating circumstances,[12] the trial judge instructed the jury that they should not limit their consideration of nonstatutory mitigating circumstances to the statutory examples and that they could consider any other circumstances as reasons for either imposing a life sentence or not imposing the death sentence. Additionally, the trial judge clarified that the jury did not "have to find the existence of a mitigating circumstance beyond a reasonable doubt." We find that the sentencing jury was not precluded from considering as mitigating factors, any aspect of Bell's character, or record; or any circumstances of the offense that Bell proffered as justifying a sentence other than death. *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *see Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Therefore, the sentencing jury's determination of Bell's death sentence did not violate the Eighth Amendment.

■ Finally, Bell asserts that the trial judge failed to instruct the sentencing jury that it could not consider Bell's mental illness as a factor in aggravation of punishment. In making this argument, Bell assumes the jury sentenced him to death because it believed Bell's mental illness made him a greater risk to society. We disagree. Bell's contention is purely speculative. He fails to present any evidence supporting his belief that the jury treated his mental illness as a nonstatutory aggravating circumstance, and not as a mitigating factor. Furthermore, the trial judge

instructed the jurors that Bell's mental illness was to be considered only as a statutory mitigating circumstance. Contrary to Bell's assertion, the trial judge's instructions did not treat Bell's alleged mental illness as an aggravating factor instead of a mitigating factor. *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). And, Bell presents no evidence that the jury interpreted Bell's alleged mental illness as an aggravating factor. *See Richardson,* 481 U.S. at 206–07, 107 S.Ct. at 1706–07. We conclude, therefore, that Bell's Sixth, Eighth, and Fourteenth Amendment rights were not violated.

## XII.

■ Bell next contends that the State's comments during the penalty phase injected an arbitrary factor into the determination of the jury's verdict, thus denying him his Sixth, Eighth, and Fourteenth Amendment rights. Specifically, Bell argues the State implied (1) that the State was the personal lawyer of the victim's family; (2) that Bell was less than human (ergo, more deserving of death); and (3) that Bell did not deserve the protection of the legislative and judicial systems. To prevail on these claims Bell must prove that the State's comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)).

■ Although a prosecutor's closing argument may be grounds for reversing a conviction, *Berger v. United States,* 295 U.S. 78, 85–89, 55 S.Ct. 629, 632–33, 79 L.Ed. 1314 (1934), Bell fails to substantiate his objections to the State's comments. Bell is attempting to extract unconstitutional implications from the State's argument and use them to his advantage. Despite Bell finding the remarks distasteful to his case, we con-

---

12. The trial judge instructed the sentencing jury that their consideration of mitigating circumstances should include, but not be limited to, the following statutory mitigating circumstances:

(1) the murder was committed while the defendant was under the influence of mental or emotional disturbance;

(2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and

(3) the mentality of the defendant at the time of the crime.

clude the remarks did not carry such implications or so infect Bell's trial with unfairness as to make his resulting conviction a denial of due process. *DeChristoforo,* 416 U.S. at 643, 94 S.Ct. at 1871. Instead, we find that the State's arguments were consistent with the record and were rationally inferred from the abundance of evidence that had been presented at trial.

### XIII.

Finally, Bell contends that the evidence was insufficient to support the jury's verdict that he was guilty. The standard of review for sufficiency of the evidence claims in criminal cases is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The record demonstrates overwhelming evidence supporting the jury's guilty verdict. This argument is merely a last-ditch effort to plead that Bell was mentally ill at the time he committed the offenses, and that the trial court erred in failing to direct a verdict of GBMI when the jury returned a guilty verdict. We find that the defense had ample opportunity to establish at trial that Bell was mentally ill at the time of the crimes and could not conform his conduct to the requirements of the law. In fact, the defense made the strongest case possible that Bell was mentally ill. The State, simply presented contradicting evidence establishing Bell had the capacity to conform his conduct to the requirements of the law at the time Bell committed the crimes. We conclude that a rational trier of fact could have returned a verdict of guilty beyond a reasonable doubt instead of GBMI.

### XIV.

For the foregoing reasons, we affirm the district court's denial of Bell's federal habeas petition.

*AFFIRMED.*