Kevin DeWayne **CARDWELL**, Petitioner,

v.

**J.D. NETHERLAND, Warden,**
**Respondent.**

**Civil Action No. 96–1516–AM.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 1, 1997.

Dennis W. Dohnal, Brenner, Dohnal, Evans & Yoffy, P.C., Richmond, VA, Pleasant S. Brodnax, III, Bullock & Brodnax, Alexandria, VA, Robert L. Jenkins, Jr., Robert L. Jenkins, Jr., P.C., Alexandria, VA, for Petitioner.

Robert Q. Harris, Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, for Respondent.

## POST–CONVICTION PROCEEDING

### *MEMORANDUM OPINION*

ELLIS, District Judge.

The matter comes before the Court on a petition by Kevin DeWayne Cardwell ("Cardwell") for relief from the sentence of death imposed on him by the Commonwealth of Virginia, pursuant to 28 U.S.C. § 2254. For the reasons that follow, Cardwell's petition must be dismissed.

### I.[1]

Kevin DeWayne Cardwell robbed and murdered Anthony Brown on November 20,

---

1. The facts of this case are derived, in part, from the findings of the Supreme Court of Virginia in its review of Cardwell's trial on appeal, *Cardwell v. Commonwealth*, 248 Va. 501, 450 S.E.2d 146,

1991. Brown, a fifteen year-old boy from New York City, had traveled by bus from New York to Richmond on November 20 carrying drugs strapped to the inside of his thigh. Tina Poindexter was to meet Brown when he arrived at the Richmond bus station. Before meeting Brown, Poindexter informed Cardwell that Brown was traveling from New York to Richmond with a shipment of drugs, information that Cardwell shared with his friends, Jermaine Jones, Richard Claiborne, and Craig Coles. Poindexter drove her car to the bus station and met Brown as planned. Claiborne had also driven to the bus station in Coles' car with Cardwell, Coles, and Jones aboard as passengers. After meeting Brown, Poindexter led him to her car. As soon as Poindexter and Brown entered Poindexter's car, Cardwell, Coles, and Jones jumped into the back seat for the purpose of taking the drugs from Brown. To this end, Coles held Brown, while Cardwell, armed with both his inoperable .25 caliber pistol and Claiborne's operable .380 caliber automatic pistol, stole Brown's duffle bag and his shoes. The robbers then fled to Cardwell's and Jones' apartment to survey their spoils.

The robbery's yield disappointed the robbers. It consisted of Brown's boots, some clothes in the duffle bag, and about twelve to fifteen dollars, but no drugs. The conspirators' disappointment was allayed somewhat when Poindexter, betraying Brown a second time, called Cardwell to disclose that Brown still possessed the drugs, as he had concealed them by strapping them to his inner thigh. Cardwell instructed Poindexter to lure Brown to Cardwell's apartment under the ruse that she had some friends who could help Brown retrieve his belongings. This time Cardwell had more in mind than robbery. He announced to his confederates that after acquiring the drugs, he would kill Brown or knock Brown out, so that Brown could not implicate them. Jones and Coles, apparently uninterested in this new plan in-

volving escalating violence, left the apartment claiming concern that Brown would recognize their clothes or voices. Cardwell, who had changed clothes, and Claiborne, who had stayed in Coles' car during the first robbery, were apparently unconcerned about identification and remained in the apartment.

When Poindexter and Brown arrived at the apartment, Cardwell feigned sympathy over Brown's plight, provided Brown with a pair of shoes and promised assistance in recovering Brown's belongings. The four left the apartment heading for Poindexter's car, when suddenly, Cardwell turned on Brown and held him at gunpoint, pulled down his pants and removed the drugs from Brown's inner thigh. Thereafter, Cardwell forced Brown to lie down on the floor of the back seat of Poindexter's car. Poindexter and Claiborne got into the front seat and, with Poindexter driving, the four headed for Goochland County where Cardwell had planned to dispose of Brown. Brown, begging that his life be spared, never made it to Goochland County. Poindexter soon realized that she did not have enough gasoline to drive to the intended site in Goochland County. Moreover, the conspirators were concerned with the prospect of going to a filling station with Brown lying face down on the floor of the car at gunpoint. Thus, Cardwell directed Poindexter to drive behind a shopping center at the intersection of Patterson Avenue and Pump Road in Henrico County. There, in the woods behind the shopping center, Cardwell murdered Brown. The particular sequence of events is relevant.

On arriving behind the shopping center, Cardwell demanded Claiborne's working .380 caliber automatic pistol. Claiborne testified that he believed that Cardwell wanted this larger pistol, as opposed to the inoperable .25, because the larger pistol would be a more effective tool with which to knock Brown unconscious. Cardwell then led Brown into the woods behind the shopping center. Claiborne, who waited for a moment

149–50 (1994), *cert. denied*, 514 U.S. 1097, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995). *See* 28 U.S.C. § 2254(e)(1) (state court findings of fact are presumed correct for the purposes of federal habeas review, and a petitioner may overcome this presumption only with "clear and convinc-

ing" evidence). Additional background facts, including the procedural history of this matter, are derived from the file and transcript of the state court trial and direct appeal, and the file of the state habeas proceeding.

before following Cardwell into the woods, testified that as he walked up to Cardwell and Brown, he heard Brown begging for his life. From a distance of ten feet, Claiborne heard a "gurgling" sound which he recognized "from the movies" as the cutting of Brown's throat. Cardwell then noticed Claiborne, telling him "I'm going to shoot him and he's going to die". Claiborne testified that at this point he said "No", and turned to walk back to the car. Two shots were fired. Thereafter, Cardwell returned to the car, gave Claiborne back the .380, and Poindexter, Claiborne and Cardwell returned to the apartment. Brown's body was left in the woods.

After Brown's murder, Cardwell disposed of the murder weapons, a six-inch steak knife and Claiborne's pistol, by placing them in a bag that, in turn, was thrown into a dumpster at the apartment complex. Yet, despite his care in seeking to eliminate physical evidence, Cardwell was less cautious with respect to recounting his murderous deeds. Thus, Cardwell boasted to friends and associates of cutting Brown's wrists, giving Brown a "Cuban necktie" (cutting his throat), and shooting him when he did not die from the wounds. On one occasion, Cardwell, observing birds circling in the distance, suggested to a girlfriend that those birds were flying above Brown's body. Indeed, Cardwell made little effort to hide his murderous acts from friends and acquaintances.

Meanwhile, Brown's body was not discovered in the woods behind the shopping center until January 26, 1992, over two months after his death. A family on an afternoon walk in the woods behind their subdivision came across Brown's decomposed body on the spot where he had been killed by Cardwell. Medical examiners were able to identify Brown using dental records. They concluded from the autopsy that Brown had been murdered in November 1991 and that rapid decomposition of the wrists and neck suggested that knife-inflicted entry wounds on those areas had occurred prior to the decomposition process. Also identified were two gunshot wounds to the back of Brown's head, either of which would have resulted in immediate unconsciousness and death. Further, the medical examiner concluded that there were no marks on Brown's body suggesting that he had struggled or defended himself from the fatal attack.

The investigation that ensued led police to the conspirators who had robbed Brown and ultimately to Cardwell, who was indicted in the Circuit Court for Henrico County on May 10, 1993 for (i) capital murder committed during the commission of an abduction with the intent to obtain money or other benefit, (ii) capital murder committed during armed robbery, (iii) robbery, (iv) abduction with intent to obtain money or other benefit, (v) use of a firearm during the commission of a murder, (vi) use of a firearm during the commission of a robbery, and (vii) use of a firearm during the commission of an abduction. On May 20, 1993, attorney Robert Geary was appointed to represent Cardwell, and trial was set for July 19, 1993. Thereafter, on June 22, 1993, Geary requested a continuance of the trial so that he and his newly appointed co-counsel, John McGarvey, could prepare more adequately for Cardwell's defense. This motion was granted, and trial was set for September 7–10, 1993. But in granting the continuance, the trial judge admonished the parties to bring matters that might delay proceedings promptly to his attention, making clear that further continuances would be disfavored.[2]

On August 2, 1993, Cardwell moved for the appointment of experts to assist in the preparation of information concerning Cardwell's history, character and mental condition for use in the jury's consideration of the appropriate sentence should Cardwell be convicted of one of the capital offenses. The next day, August 3, the trial judge appointed Dr. Randy Thomas, an expert selected by Cardwell's trial counsel. On this date, trial counsel discovered that Thomas would be on vacation

**2.** Specifically, the trial judge stated that:

I want to reemphasize that the Court fully expects to try the case commencing on September 7, therefore that any additional motions or if the defense ... is not satisfied with the discovery, then I expect either party to bring those matters promptly to the Court's attention. I'm not going to be waiting until the last minute to rule on motions of this nature.

until August 25, and trial counsel subsequently learned that Thomas would be unable to complete an adequate evaluation in time for trial. Yet, Cardwell's trial counsel inexplicably waited until August 23 to ask for a continuance of the September 7 trial date. This tardy request was summarily denied by the trial judge in an order dated August 24, and trial commenced on September 7, 1993.

The guilt phase of Cardwell's trial consumed only two days, September 7 and 8. Cardwell pled not guilty to each charge of the indictment, and after a jury was empaneled, the Commonwealth adduced its evidence. Specifically, the Commonwealth adduced testimony from Henrico County officials involved in the investigation of the Brown homicide, including Officer Robert L. Bates, the police officer who first secured the crime scene, Investigator James D. Jamison, a forensics specialist who performed an initial investigation of the evidence at the scene, and Dr. Marcella F. Fierro, a forensic pathologist who performed the autopsy on Brown and testified as to the cause of death, the time of death, and the efforts to identify Brown from his decomposed remains. Further testimony was adduced from Ms. Annie MacMillan, Anthony Brown's mother, and Philip Nicely, the individual who found Brown's body during a walk in the woods.

But the most compelling testimony in the trial came from Cardwell's friends, both those who had participated in the robbery and those to whom Cardwell had boasted of his murderous deeds. Michelle Chapman, the friend of a woman Cardwell dated after the murder of Brown, testified that she overheard Cardwell on the phone discussing plans to implicate others in the Brown killing.[3] Tonya Perotte, a former girlfriend of Cardwell's,[4] testified in detail about facts of the murder as related to her by Cardwell. Jones and Coles testified regarding their involvement in the bus station robbery, and to the details of Brown's murder as recounted to them by Cardwell. But even more damning was the testimony of Claiborne, Cardwell's companion and accomplice in the second robbery. Claiborne's testimony recounted the abduction, the trip to the woods behind the shopping center, Brown's pleas for his life, the slashing and shooting of Brown by Cardwell, and the subsequent efforts to dispose of the murder weapons. In the final analysis, the testimony of Cardwell's friends and associates filled any gaps left open by the physical evidence.

Cardwell presented only one witness in the guilt phase of his trial. Yolanda Turner, a friend of Cardwell's, was called apparently to testify concerning a conversation she overheard that, in Cardwell's view, suggested that someone other than Cardwell, presumably Claiborne, was the triggerman in the Brown murder. After some preliminary questions, counsel for Cardwell attempted to adduce the relevant testimony and the Commonwealth objected on the basis of hearsay. After voir dire of Turner, and argument from counsel, the trial judge allowed the disputed testimony in part. Yet, trial counsel McGarvey, at the direction of Cardwell, did not pursue that line of testimony with Turner. The trial judge repeated the permissible scope of Turner's testimony, but Cardwell himself confirmed that he did not wish Turner to be examined further. Thereafter, the defense rested without presenting any evidence beyond the preliminary examination of Turner and the cross-examination of prosecution witnesses. Cardwell did not testify and no rebuttal case was offered.

Cardwell's motions for judgment of acquittal were denied, and the jury was instructed as to the law concerning each count of the indictment. In its closing argument, the government relied on the testimony of Cardwell's friends. In response, Cardwell's counsel argued that Claiborne had killed Brown, and that upon Claiborne's arrest, he and his friends conspired to frame Cardwell. After arguments of counsel and the trial judge's

---

3. Specifically, Chapman testified that she overheard Cardwell stating to an unknown third person "something to the effect that 'you have to get it off on Tina [Poindexter] and Richard [Claiborne]'."

4. Perotte and other friends of Cardwell also refer to the defendant as Xavier Brown and Dominique Marshall, other names by which Cardwell was known.

final instructions, the case was submitted to the jury. The jury deliberated less than a day, returning a verdict of guilty of all of the charges in the indictment. Punishment was fixed by the jury on the five non-capital offenses ranging from two years, for use of a firearm while committing a robbery, to life in prison, for abduction.[5] The jury was directed to return the following day to hear evidence and arguments relevant to the two capital murder convictions.

. When the capital sentencing phase of Cardwell's trial began on September 9, Cardwell's counsel renewed his request for a continuance to permit Dr. Thomas, a mental health expert, to complete an evaluation of Cardwell. For the purposes of the motion for a continuance, trial counsel presented a preliminary report prepared by Thomas on September 1 in which Thomas concluded that several areas with respect to Cardwell's mental health warranted further inquiry. The preliminary report made clear that Thomas had not reached any opinion "to a reasonable degree of professional certainty." And specific tests were identified as necessary for Thomas to arrive at a meaningful opinion. Thus, trial counsel represented that he was not prepared for the sentencing phase and that a continuance was therefore appropriate. The trial judge received Thomas' report into the record, but refused to grant a continuance. The capital sentencing phase of Cardwell's trial proceeded as scheduled.

In this phase, the Commonwealth sought to prove the existence of one or both of two aggravating factors, namely, (i) the vileness of the crime, and (ii) Cardwell's future dangerousness.[6] On the question of future dangerousness, the Commonwealth introduced Cardwell's seven previous convictions and testimony concerning those convictions. Specifically, Lynchburg Police Officer Pat-

rick K. Morris testified to the circumstances surrounding Cardwell's arrest for possession with intent to distribute marijuana, and Officer Mark Williams of the Richmond Police Department testified to the circumstances surrounding Cardwell's arrest for drunk-in-public. Pam Lavier, a Virginia Probation and Parole Officer, testified concerning interviews she had conducted with Cardwell in which he (i) indicated his use of aliases such as Xavier Brown, and (ii) related that he was raised in a happy environment. Diana Lipscomb, a Cardwell acquaintance, testified that Cardwell dealt drugs, and had become angered once and carelessly shot a pistol in her house. Cardwell's former girlfriend, Tonya Perotte, testified that Cardwell had boasted about murdering Brown, and had never shown remorse. She testified further to other examples of Cardwell's violent tendencies including (i) attempted assault with a baseball bat on Perotte and her child, (ii) shooting a man in the foot, and (iii) beating a man with a broken bottle. Finally, the Commonwealth adduced evidence from Michelle Chapman concerning Cardwell's violent nature. Chapman testified to (i) a violent attack on a man named Jules in Lynchburg, (ii) the firing of a gun in a house occupied by Chapman and Lipscomb, and (iii) a burglary of a grocery store in which the window was shattered and products were stolen.

For his part, Cardwell adduced no evidence to rebut the aggravating factors pursued by the Commonwealth, calling only one witness, his grandmother, Donzell Cardwell, to provide evidence in mitigation of the offense. Specifically, Ms. Cardwell testified that she raised Cardwell because her daughter, Cardwell's mother, was not interested in Cardwell, and because Cardwell's father, who was in and out of prison, also did not take an active interest in Cardwell's life. Ms. Cardwell testified that Cardwell had been neglect-

---

5. Specifically, the jury fixed Cardwell's punishment at (i) life imprisonment for abduction; (ii) 20 years in prison for robbery; (iii) 10 years for the firearms offenses; and (iv) a $100,000 fine for the abduction.

6. Virginia Code § 19.2–264.2 provides that the death penalty
 shall not be imposed unless the court or jury shall (1) ... find that there is a probability that **the defendant would commit criminal acts of** **violence that would constitute a continuing serious threat to society** or that **his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim;** and (2) recommend that the penalty of death be imposed.
 (emphasis added).

ed by his parents as a child and that this neglect had led to Cardwell's having nightmares when he was a boy. Nevertheless, Ms. Cardwell testified that Cardwell had never been in any trouble as a boy, and that she had been unaware of any criminal conduct before Cardwell's capital trial.

At closing argument in the sentencing phase, the Commonwealth relied on evidence adduced regarding other criminal acts and violent episodes from Cardwell's past to demonstrate Cardwell's future dangerousness and recapped the details of the Brown murder, focusing on Brown's pleas for his life, the execution style murder, and the gruesome nature of the killing to demonstrate the vileness of Cardwell's crimes. Cardwell's trial counsel argued that Cardwell was a young man in search of acceptance, feeling alienated from his father's Jamaican family and neglected by a mother who did not want anything to do with him. The sought after acceptance, by Cardwell's lights, was realized in the form of a violent lifestyle of drug dealing, a lifestyle that led ultimately to Brown's death. Thus, trial counsel urged the jury to find that Cardwell's environment and background mitigated the culpability and vileness of his act and rebutted the propriety of the death sentence.

After the closing argument and instructions from the trial judge, the jury began their deliberations concerning the imposition of a death sentence. During their deliberations, the jury requested that the trial judge inform them whether parole would be allowed if life imprisonment was imposed. The trial judge convened the jury, advising them that the Supreme Court of Virginia did not allow him to answer that question and that they must resolve the sentencing issue without the benefit of this information. Thereafter, on September 9, the jury returned a verdict of death, finding that the offense was outrageously and wantonly vile and that death was therefore warranted notwithstanding consideration of the evidence in mitigation.

After a jury recommends a sentence of death, Virginia law requires the trial judge to direct an investigation of the defendant and all other factors relevant to whether a death sentence is appropriate. *See* Va. Code Ann. § 19.2–264.5. For good cause shown, a trial judge may set aside a death sentence and impose a sentence of life in prison. *Id.* Accordingly, the trial judge ordered preparation of an investigative report and, thereafter, conducted a hearing on November 10, 1993 concerning whether the jury's recommended death sentence should be confirmed or set aside. At this hearing, the trial judge noted that the investigative report had been completed by the probation office. The trial judge further noted that counsel had requested a trial continuance to complete an expert mental evaluation, yet, even now, no completed mental evaluation had been submitted. On November 10, 1993, the trial judge affirmed the jury's sentence of death on the basis of the vileness of the offense conduct, notwithstanding evidence in mitigation.

Cardwell appealed his convictions and the sentence of death to the Supreme Court of Virginia on several grounds. With respect to pre-trial rulings by the trial judge, Cardwell appealed (i) the denial of his constitutional challenge to the Virginia death penalty statutes, (ii) the denial of a continuance both on August 24 and on September 9, and (iii) the denial of a request to require the Commonwealth to proceed on only one of the capital murder charges. And, with respect to the trial judge's rulings during the guilt phase of the trial, Cardwell appealed (i) the refusal to strike evidence relating to the abduction charge, and (ii) the rejection of a jury instruction concerning uncorroborated accomplice testimony. Finally, with respect to the trial judge's rulings during the capital sentencing phase of the trial, Cardwell appealed (i) a jury instruction regarding the imposition of the death penalty, (ii) the failure to advise the jury that Cardwell would be ineligible for parole for 25 years if sentenced to life imprisonment, and (iii) the admission of evidence in the penalty phase involving unadjudicated criminal conduct. In an opinion dated November 4, 1994, the Supreme Court of Virginia rejected the grounds for appeal and upheld the convictions. *See Cardwell v. Com.,* 248 Va. 501, 450 S.E.2d 146, 150–155 (1994), *cert. denied,* 514 U.S. 1097, 115 S.Ct. 1826,

131 L.Ed.2d 747 (1995). Moreover, as required by statute, the Supreme Court of Virginia reviewed Cardwell's death sentence to determine (i) whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (ii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases. *See* Va. Code Ann. § 17–110.1. In this regard, the Supreme Court of Virginia concluded that the jury's finding was supported by the evidence and did not suggest the influence of any arbitrary factor. *Cardwell*, 450 S.E.2d at 155. Further, the Supreme Court of Virginia reviewed the sentence in light of a compilation of capital murder cases in Virginia, concluding that Cardwell's death sentence was not excessive or disproportionate compared to other sentences imposed in similar circumstances. *Id.* at 156. Thus, all of Cardwell's convictions and his death sentence were upheld on direct appeal. His petition for a writ of certiorari to the United States Supreme Court was denied on May 1, 1995. *Cardwell v. Virginia*, 514 U.S. 1097, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995).

In May 1995, Cardwell wrote to the trial judge requesting the appointment of counsel to represent him in habeas corpus proceedings, pursuant to Va. Code Ann. § 19.2–163.7. Gerald Zerkin, an experienced criminal defense lawyer, was appointed for this purpose in July 1995. In August 1995, Cardwell filed a motion for the appointment of experts and an "Incomplete Original Petition." Thereafter, Cardwell filed several motions in the Supreme Court of Virginia and the Circuit Court for Henrico County requesting the appointment of experts to assist in the preparation and presentation of Cardwell's petition, including investigators and mental health professionals. Moreover, Zerkin moved on Cardwell's behalf for the disclosure of exculpatory evidence. The motions filed in the Circuit Court for Henrico County were dismissed by order dated December 8, 1995 because the trial judge concluded that he had no jurisdiction to consider these motions. The motions filed in the Supreme Court of Virginia were decided by order dated December 15, 1995. In this order, Cardwell was granted thirty days to amend the "Incomplete Petition" filed previously in an effort to preserve Cardwell's rights, but his remaining motions were denied, the Supreme Court of Virginia stating:

> [o]n further consideration of other motions and replies filed herein, the Court denies petitioner's motions for appointment of an expert, motion for appointment of an investigator and motion for disclosure of exculpatory evidence.

*Cardwell v. Angelone*, Record No. 951593 (Order of Supreme Court of Virginia Order dated December 15, 1995).

Thereafter, on January 23, 1996, Cardwell, by counsel, filed his amended petition for habeas corpus urging three general bases for relief. First, Cardwell claimed that he was denied effective assistance of counsel both at trial and on appeal. Specifically, Cardwell challenged (i) trial counsel's voir dire with respect to jurors' attitudes toward capital punishment, (ii) trial counsel's performance at the guilt phase of trial, including the efforts to cross-examine and impeach Claiborne, (iii) trial counsel's performance at the sentencing phase, including the failure to present evidence of Cardwell's background and mental health, and (iv) trial counsel's failure to develop the expert testimony concerning Cardwell's mental health between the trial and the final sentencing hearing in November.

Second, Cardwell claimed that the Commonwealth's conduct during trial violated due process. Specifically, Cardwell contended (i) that the Commonwealth failed to provide him with exculpatory evidence, and (ii) that the Commonwealth allowed Cardwell's friends and associates to give false testimony against Cardwell.

Third, Cardwell claimed that he was denied a meaningful and rational review of his death sentence as mandated by Va. Code § 17–110.1. Specifically, Cardwell contended that the Supreme Court of Virginia invariably fails to discuss mitigating evidence in reviewing sentences of death, and has never found that a death sentence was inappropriate. Accordingly, by Cardwell's lights, the Supreme Court of Virginia's allegedly *pro*

*forma* review of his death sentence is constitutionally inadequate.

Cardwell's petition requested an evidentiary hearing on his request for state habeas relief, and prayed that his conviction and sentence of death be set aside. Thereafter, the Supreme Court of Virginia received a motion by the Commonwealth to dismiss the petition and a response to this motion by Cardwell. No evidentiary hearing was held. And on May 3, 1996, the Supreme Court of Virginia dismissed Cardwell's petition. Presumably, the Supreme Court of Virginia considered and rejected each of Cardwell's asserted bases for relief, yet the order tersely stated only that:

> Applying the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), to petitioner's allegation III, and finding no merit in other complaints raised by petitioner, the Court is of opinion that the writ of habeas corpus should not issue as prayed for. It is therefore ordered that the said petition be dismissed.

Following dismissal of his state habeas petition, Cardwell now seeks federal habeas relief, pursuant to 28 U.S.C. § 2254. By Order dated October 23, 1996, three attorneys were appointed to represent Cardwell in the preparation and presentation of his petition for federal habeas corpus relief. Thereafter, Cardwell moved for the appointment of mental health experts to assist him in preparing his federal habeas petition, pursuant to 21 U.S.C. § 848(q). Specifically, Cardwell requested the appointment of a neuropsychiatrist, Dr. Robert Hart, and a clinical psychologist, Dr. Leigh Hagan, for the purpose of evaluation and analysis. This request was granted by Order dated February 24, 1997. Thereafter, on March 17, 1997, Cardwell filed the instant petition for federal habeas corpus relief, requesting an evidentiary hearing to develop facts and testimony in support of his petition. This petition included reports from Drs. Hart and Hagan evaluating Cardwell's mental health. In response, the Commonwealth opposed an evidentiary hearing, and moved to dismiss Cardwell's petition.

Accordingly, this opinion addresses:

(1) the propriety of the appointment of mental health experts to assist Cardwell in the preparation and presentation of his federal habeas petition;

(2) Cardwell's request for an evidentiary hearing on issues relevant to his petition; and

(3) the consideration and disposition of Cardwell's petition for § 2254 relief.

## II.

The analysis of the propriety of the appointment of experts properly begins with the language of § 848(q), which authorizes courts to appoint expert or investigative services for indigent defendants seeking habeas relief in capital cases, provided that such services are "reasonably necessary for the representation of defendant, whether in connection with issues relating to guilt or sentence." 21 U.S.C. § 848(q)(4)(B), (q)(9). Thus, the question presented reduces to whether the appointment of Drs. Hart and Hagan is "reasonably necessary" to Cardwell's petition for § 2254 relief.

### A.

Cardwell contends, in part, that he was denied effective assistance of counsel because of trial counsel's failure to prepare expert evidence for the sentencing phase of trial, namely, possible mitigation evidence concerning Cardwell's background and mental health. This contention was rejected by the Supreme Court of Virginia in Cardwell's state habeas proceeding. Thus, federal habeas relief is available if the state court's denial of Cardwell's ineffective assistance of counsel claims was an unreasonable application of clearly established law. *See* 28 U.S.C. § 2254(d)(1).

Ineffective assistance claims are analyzed under the two-part test articulated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test requires a petitioner to show that "(1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) 'there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceedings would have been different.'" *Bell v. Evatt*, 72 F.3d 421, 427 (4th Cir.1995), *cert. denied sub nom., Bell v. Moore*, —— U.S. ——, 116 S.Ct. 2533, 135 L.Ed.2d 1056 (1996) (citing *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068). The record is complete on trial counsel's conduct in both the guilt and sentencing phases of Cardwell's trial. It is undisputed that trial counsel failed to develop or prepare expert evidence on Cardwell's mental health in time for trial. This failure resulted from (i) counsel's delay in locating an expert to prepare the necessary information, and (ii) counsel's failure to move for a continuance in a timely fashion when it appeared that the expert evidence would not be ready in time for trial. At the threshold stage, this evidence provides Cardwell with a reasonable basis for asserting that trial counsel's behavior fell below an objective standard of reasonableness in light of the prevailing professional norms. *See Bell*, 72 F.3d at 427.

Ineffective assistance of counsel, however, also requires a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* Thus, to prevail on an ineffective assistance claim, Cardwell must show prejudice from the failure to present expert testimony related to his mental health at the sentencing phase. On this prejudice prong of the *Strickland* test, the record evidence was not developed in the state proceeding. And for the purposes of the prejudice inquiry, a complete expert report is clearly rele-

vant, for it is impossible to evaluate whether Cardwell was prejudiced by a failure to present certain expert testimony until the substance of that testimony is known. Thus, the evidence Cardwell seeks from experts is manifestly relevant to resolution of the instant petition.[7] Yet, relevance is not enough; the experts' testimony or reports must be "reasonably necessary" to this § 2254 proceeding. Thus, if Cardwell cannot introduce the results of expert evaluations for the purposes of the instant § 2254 petition, then those examinations are not "reasonably necessary" for the petition. Accordingly, this analysis must turn to whether expert reports on Cardwell's mental health can be introduced at this proceeding.

## B.

Ordinarily, a § 2254 petition is limited to the factual record developed in state court proceedings. This sensible principle follows from the statute's command that deference be accorded to state court decisions. *See, e.g.,* 28 U.S.C. § 2254(b), (e)(1). In other words, if state court is the primary forum for collateral review of a state conviction and sentence, then it would generally be inappropriate to permit a federal court to review state decisions on the basis of a factual record not considered by the state court. Embodying this principle, the amended[8] § 2254(e)(2) limits a petitioner's ability to present evidence in a federal habeas proceeding that was not considered by the state court.[9] If § 2254(e)(2) prohibits Cardwell's

---

7. Indeed, on direct appeal, the Supreme Court of Virginia considered whether the trial judge erred in denying a continuance for Cardwell to acquire Dr. Thomas' evaluation. The Supreme Court of Virginia stated that,

> [h]ad the examination been performed, we might be in a position to say whether Cardwell's rights were prejudiced. As the record stands, however, we are left to mere speculation. Under the circumstances, therefore, we cannot say that the trial court abused its discretion in denying the second continuance.

*Cardwell*, 450 S.E.2d at 152. Thus, the court recognized the importance of a complete mental evaluation to the determination of the question whether Cardwell was prejudiced by the failure to present such an evaluation.

8. *See* The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA").

9. Section 2254(e)(2) provides that:

> [i]f an applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (a) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no

introduction of evidence in this proceeding, notwithstanding the results of an expert evaluation, then the appointment of experts is not "reasonably necessary" to Cardwell's preparation of a petition. The question thus reduces to whether (e)(2) applies here to bar Cardwell's effort to develop a factual record in this federal habeas proceeding.

Section 2254(e)(2), where triggered, first requires an applicant to demonstrate an excuse for any failure to develop the factual record. The only acceptable excuses are (i) a new rule of constitutional law that was previously unavailable and that was made retroactive to cases on collateral review by the Supreme Court, and (ii) a factual predicate that could not have been previously discovered through due diligence. *See* 28 U.S.C. § 2254(e)(2)(A). But an excuse alone is insufficient, for even where an acceptable excuse is demonstrated, an applicant for federal habeas relief is eligible for an evidentiary hearing only where he further demonstrates by clear and convincing evidence that he is not guilty of the underlying offense. *See* 28 U.S.C. § 2254(e)(2)(B).[10]

Cardwell contends that the bar to evidentiary hearings articulated in subsection (e)(2) does not apply to his case because he did not "fail" to develop the factual basis of his ineffective assistance claim in state court. Thus, Cardwell contends that § 2254(e)(2) only ap-

plies where a failure to develop the record is attributable to a petitioner and not where, as here, a petitioner is denied the opportunity to develop the factual record by a state court. While no courts in this circuit have addressed the meaning of § 2254(e)(2), courts elsewhere have addressed this issue reaching conflicting results. Some courts have concluded that evidentiary hearings are only limited by (e)(2) if the failure to develop facts is fairly attributable to the applicant,[11] while others have concluded that evidentiary hearings are limited by (e)(2) for any failure to develop a factual record, regardless of the cause.[12] An analysis of § 2254(e)'s plain meaning, however, points persuasively to the conclusion that neither of these interpretations accurately define the proper scope of the subsection.

■ The plain meaning of § 2254(e)(2) rebuts a "strict liability" interpretation of that subsection, *i.e.,* an interpretation that triggers the subsection's limitations whenever, for any reason, the factual record is undeveloped. Section 2254(e)(2) provides that the subsection applies where **"the applicant has failed** to develop the factual basis of a claim...."** Congress could have easily provided that (e)(2) applies whenever an evidentiary hearing is sought, or wherever the state record is undeveloped. Yet, Congress choose to limit (e)(2) to circumstances where

reasonable fact finder would have found the applicant guilty of the underlying offense.

**10.** It is unresolved in this circuit whether the "innocence" requirement of § 2254(e)(2)(B) requires a petitioner facing the death penalty to demonstrate innocence of the crime of which he was convicted or merely "innocence of the death penalty." *See, e.g., Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)(pre–AEDPA habeas case holding that relief is warranted where there is reasonable probability that, but for constitutional errors, petitioner would have been sentenced to death). The clear language of subsection (e)(2)(B) commands that a petition demonstrate by clear and convincing evidence that he is "not guilty of the underlying offense." This language strongly suggests that the "innocence" requirement is not satisfied where a petitioner can show only "innocence of the death penalty." *See Kornahrens v. Moore,* No. 96–582 (4th Cir. July 18, 1996) (Hamilton, J. concurring); *cf. Hope v. United States,* 108 F.3d 119, 120 (7th Cir.1997)(holding that identical language in § 2254(b)(2)(B)(ii) refers only to the

offense of conviction and does not permit attack on a sentence); *Burris v. Parke,* 116 F.3d 256, 258–59 (7th Cir.1997) (reserving question whether the interpretation adopted in *Hope* applies for purposes of § 2254(e)(2)). Given the conclusion that § 2254(e)(2) does not apply here, the question whether demonstrating "innocence of the death penalty" satisfies (e)(2)(B) is not addressed.

**11.** *See Love v. Morton,* 112 F.3d 131, 136 (3rd Cir.1997); *Washington v. Mazurkiewicz,* 1997 WL 83771 (E.D.Pa. Feb. 25, 1997).

**12.** *See Burris v. Parke,* 948 F.Supp. 1310, 1324–27 (N.D.Ind.1996)(citing *Bean v. Calderon,* No. CIV S–90–0648 WBS/GGH, at 8 (N.D.Cal. May 15, 1996)), *aff'd on other grounds,* 116 F.3d 256 (7th Cir.1997). Although the Seventh Circuit panel affirmed the district court conclusion, in *Burris,* that an evidentiary hearing was not required, the panel ruled that § 2254(e)(2) did not apply in that case, thus rejecting the district court's "failure for any reason" interpretation of § 2254(e)(2). *See Burris,* 116 F.3d at 258–59.

"the applicant has failed." A "strict liability" interpretation of (e)(2) would render the reference to "the applicant" meaningless. A construction of (e)(2) that leads to this result should be avoided because "a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). The reference to "the applicant" is given operative effect by interpreting (e)(2) in such a manner that this subsection is not triggered by every undeveloped record, whatever the cause. Thus, the plain meaning of § 2254(e)(2) is inconsistent with an interpretation that would apply this subsection whenever a factual record, for whatever reason, is not developed in the state courts. *See also Burris*, 116 F.3d at 258; *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.1997); *Love*, 112 F.3d at 136.

▪ Some courts rejecting a "strict liability" application of § 2254(e)(2) have limited the application of this section to circumstances in which the failure to adduce evidence is "fairly attributable to the applicant." *See Love*, 112 F.3d at 136; *Mazurkiewicz*, 1997 WL 83771.[13] Yet, this interpretation, like the "strict liability" interpretation of (e)(2), is unpersuasive. Subsection (e)(2)(A) limits an evidentiary hearing to claims that rely on (i) a retroactive new rule of constitutional law, or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence. The failure to develop a factual predicate that could not have, through due diligence, been discovered, is a failure "not fairly attributable to the applicant." Thus, if (e)(2) does not apply to circumstances where the failure is not "fairly attributable to the applicant"

then (e)(2)(A)(ii) is superfluous. In other words, (e)(2)(A)(ii) would be unnecessary because where new facts arise that could not have been discovered by a diligent petitioner, subsection (e)(2) would be inapplicable. This construction of (e)(2) is to be avoided for it is well-established that courts should be "reluctant to interpret statutory provisions so as to render superfluous other provisions within the same enactment." *See United States v. Ivester*, 75 F.3d 182, 185 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 2537, 135 L.Ed.2d 1060 (1996). Thus, the plain meaning of § 2254(e)(2) requires that it (i) be inapplicable in a subset of circumstances where an applicant seeks to introduce new evidence, and (ii) be applicable in a subset of circumstances where a failure to develop the state court record is "not fairly attributable to an applicant." Section 2254(e)(2) meets these requirements when construed not to apply, as here, to an applicant who attempts to develop a record in the state proceeding but is denied that opportunity by the state court.

This conclusion also follows from the plain meaning of the pivotal term "failure." Webster's defines "failure", in relevant part, as the "omission of performance of an action or task; ... neglect of an assigned, expected, or appropriate action." *See* Webster's Third International Dictionary, at 815 (1993).[14] This definition provides a useful distinction between subsets of failures not "fairly attributable to an applicant." Where facts are unknown to an applicant, then that applicant will omit to perform the action or task of developing those facts in the state court, *i.e.*, the applicant will "fail" to develop those facts.[15] Yet, where, as here, an applicant

<hr/>

**13.** This interpretation is evidently shared by President Clinton, who, at the occasion of signing the amendments that added § 2254(e)(2) to the federal habeas statute, stated that

If [§ 2254(e)(2)] were read to deny litigants a meaningful opportunity to prove the facts necessary to vindicate Federal rights, it would raise serious constitutional questions. I do not read it that way. The provision applies to situations in which "the *applicant* has failed to develop the factual basis" of his or her claim. Therefore, section 104(4) is not triggered when some factor that is not fairly attributable to the

applicant prevented evidence from being developed in State court.

(emphasis in original). Statement of President William J. Clinton on Signing the Antiterrorism and Effective Death Penalty Act of 1996 (April 24, 1996).

**14.** *See also Burris*, 116 F.3d at 258–59 (" 'Failure' implies omission—a decision not to introduce evidence when there was an opportunity or a decision not to seek an opportunity.").

**15.** In those circumstances, (e)(2) applies, but (e)(2)(A) can provide an excuse for this failure

attempts to develop a factual basis for his claim in a state proceeding and is denied the opportunity to do so, then the applicant has not neglected or omitted the development of facts in state court. In this event, the limitations of subsection (e)(2) do not apply.[16]

In sum, § 2254(e)(2) is designed to restrict the development of facts in federal habeas proceedings that were not known to or considered by a state court. Yet, (e)(2) cannot apply to the entire universe of undeveloped state records, for were it to do so, its express limitation to circumstances where **"the applicant** has failed" would have no meaning. Thus, (e)(2) must only apply to a subset of applicants seeking to introduce new facts in federal court. But this subset must include some applicants who, through no fault of their own, have failed to develop a record. Otherwise, (e)(2)(A)(ii) would serve no purpose. These interpretive guideposts lead to the conclusion that an applicant "fails" when he does not take or seek the opportunity to develop evidence in a state court proceeding. This is where (e)(2) applies. And this is where (e)(2)(A) may forgive the failure if new facts or a retroactive change in constitutional law form the basis of a claim. In contrast, an applicant does not "fail" where he seeks, but is denied, the opportunity to develop facts in state court. In this event, the rigorous standard of § 2254(e)(2) will not apply.[17]

These principles, applied here, point persuasively to the conclusion that (e)(2) is inapplicable to Cardwell's effort to introduce mental health reports and testimony. It is undisputed that Cardwell did not submit expert mental health reports or testimony in state court, either at trial, on direct appeal, or in the state habeas proceeding. Of course, given that trial counsel's failure to procure a complete mental health evaluation is the basis of Cardwell's ineffective assistance claim, it would be circular to require him to have developed at trial or on direct appeal, the very record, the absence of which is the basis of his claim. In the state habeas proceeding, Cardwell attempted to develop the factual basis of his ineffective assistance claim, filing motions in the Supreme Court of Virginia for the appointment of experts to complete his mental evaluation and for an evidentiary hearing. These motions were dismissed summarily.[18] Thus, Cardwell did not neglect the opportunity to develop factual basis for his ineffective assistance claim in the state court. To the contrary, he was denied the opportunity to develop the facts by the state court. Accordingly, the limitations of § 2254(e)(2) do not apply.

Given that § 2254(e)(2) does not apply, Cardwell's right to expand the record and obtain an evidentiary hearing will be governed by the Rules Governing § 2254

---

such that an evidentiary hearing may be available. *See* 28 U.S.C. § 2254(e)(2).

16. *See Burris,* 116 F.3d at 258–59 ("To be a 'failure' under [§ 2254(e)(2)] the deficiency must reflect something the petitioner did or omitted."); *Jones,* 114 F.3d at 1013 ("It is clear that Jones did not 'fail[ ] to develop' the factual basis of either of his claims; rather, the state courts denied him the opportunity to develop the facts by failing to hold an evidentiary hearing.").

17. As a practical matter, this result is necessary to permit adequate review of state court applications of federal law under 28 U.S.C. § 2254(d)(1). Otherwise, "a state could insulate its decision from collateral attack by refusing to grant evidentiary hearings in its own courts." *See Burris,* 116 F.3d at 258–59. While § 2254, as amended, reflects considerable deference to state court decisions, the statute does not reflect Congressional intention to allow state courts to insulate their decisions on federal law from federal review.

18. It appears from the record that Dr. Hart had prepared mental health evidence on Cardwell during the state habeas proceeding, presumably in hopes that he would be appointed as an expert in that proceeding. This evidence was never presented in the state habeas proceeding. Thus, the Commonwealth contends that the failure to present Hart's evidence during the state habeas is an omission by Cardwell that triggers (e)(2) notwithstanding the interpretation of that section adopted here. This is unpersuasive. Cardwell's motions in the state habeas proceeding for the appointment of experts and for an evidentiary hearing were summarily denied. At this point, it was clear that the Supreme Court of Virginia would not accept Cardwell's expert testimony. Cardwell is not subject to (e)(2) by reason of his failure to provide the state court with evidence that the court had expressly declined to accept or consider.

Cases in the Federal Courts ("Rules Governing § 2254 Cases"). These rules allow discovery, an expansion of the record, and an evidentiary hearing, for good cause shown, at the discretion of the district judge. *See* Rules 6, 7, 8, Rules Governing § 2254 Cases. Thus, should expert mental health reports provide facts relevant to Cardwell's ineffective assistance claim, they may be accepted into the record for purposes of this § 2254 petition. Given this, it follows that these reports are "reasonably necessary" for Cardwell's federal habeas representation and the appointment of Drs. Hart and Hagan, pursuant to 21 U.S.C. § 848(q), is appropriate.

## III.

Cardwell filed his § 2254 petition on March 17, 1997 together with the reports of Drs. Hart and Hagan, and requested an evidentiary hearing to "present witnesses and testimony as well as argument of counsel in support of the allegations contained in his petition." The Commonwealth opposes both the request for an evidentiary hearing, and any expansion of the record to include the expert reports prepared by Drs. Hart and Hagan. Given that § 2254(e)(2) does not apply to the expert reports or testimony on Cardwell's mental health, *see* Part II. B., *supra*, Cardwell's request to expand the record and conduct an evidentiary hearing is controlled by the Rules Governing § 2254 Cases.

Where a § 2254 petition is not dismissed summarily, the reviewing court may permit an expansion of the record to include additional materials, such as expert reports, relevant to the determination of the merits of the petition. *See* Rule 7, Rules Governing § 2254 Cases.[19] Having determined that the

reports of mental health experts are relevant to the determination of the merits of Cardwell's ineffective assistance claim, the record considered on this federal habeas petition is expanded to include these reports.

■ A reviewing court must further "determine whether an evidentiary hearing is required," in light of the petition, the answer, the transcript and record of state court proceedings, and any expanded record evidence. *See* Rule 8, Rules Governing § 2254 Cases. If a hearing is not required, "the judge shall make such disposition of the petition as justice shall require." The facts presented in the record and transcripts of the state court proceedings, the reports of Drs. Hart and Hagan, and the arguments presented in the pleadings and at oral argument point persuasively to the conclusion that an evidentiary hearing is not required to address the claims raised by Cardwell in his petition. Accordingly, Cardwell's request for an evidentiary hearing is denied.

## IV.

Cardwell's petition seeks federal habeas corpus relief from his conviction and sentence of death, both of which Cardwell contends are unconstitutional. Before considering the merits of this petition, threshold questions are presented with respect to both exhaustion and the appropriate standard of review.

### A.

■ The first threshold question is exhaustion. Section 2254 provides that, except in limited circumstances not applicable here,[20] federal habeas relief may not be granted unless an applicant has exhausted

---

19. Specifically, Rule 7 provides, in relevant part, that

> (a) ... the judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition.
> (b) ... The expanded record may include, without limitation, letters predating the filing of the petition in the district court, documents, exhibits, and answers under oath ... to written interrogatories propounded by the judge.

20. Specifically, § 2254(b)(1) provides that:

> [a]n application for a writ of habeas corpus ... shall not be granted unless it appears that—
> (A) the applicant has exhausted the remedies available in the courts of the State; or
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exists that render such process ineffective to protect the rights of the applicant.

While an application cannot be granted where a petitioner fails to exhaust state remedies, an application can be denied notwithstanding such a failure. *See* 28 U.S.C. § 2254(b)(2).

the remedies available in state courts [21] Exhaustion under § 2254 requires a petitioner to avail himself of all avenues of state relief such that he has no right remaining "under the law of the State to raise, by any available procedure, the question presented." *See* 28 U.S.C. § 2254(c).

Cardwell contends that every claim in the instant petition has been fully exhausted by having been presented to the state courts either at trial, on appeal, or in the state habeas proceeding. The Commonwealth disagrees in part, disputing whether each of the claims in the petition were presented to the state courts on appeal or in the state habeas petition. Yet, this dispute does not affect the exhaustion inquiry. Cardwell's direct appeal and his state habeas petition were denied and Cardwell has no further state habeas opportunities available. *See* Va. Code § 8.01–654.1.[22] Thus, even assuming that Cardwell has failed to present a claim to the state courts on appeal or in the state habeas petition, this claim is now procedurally barred from further consideration in state court. *See Bassette v. Thompson,* 915 F.2d 932, 936–37 (4th Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991)(concluding that Virginia law bars courts from considering claims that could have been raised in earlier proceeding). Indeed, the Commonwealth agrees that all of Cardwell's viable claims are exhausted.

Thus, notwithstanding any dispute whether claims raised in the instant petition were raised in Cardwell's state proceedings, it is true, as the parties agree, that the exhaustion requirement of § 2254(b) is satisfied.

**B.**

■ The appropriate standard of review is the second threshold question presented. Section 2254(d) establishes the standard of review to be applied by a federal court considering a state prisoner's petition for federal habeas relief. This section mandates deference to state court decisions on claims adjudicated on the merits in the state court, and allows a federal court to grant habeas relief only where the state court's resolution of a claim (i) is contrary to, or an unreasonable application of, clearly established federal law; or (ii) is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[23] For the purposes of the instant petition, Cardwell contends that the Supreme Court of Virginia's denial of his ineffective assistance claims constitutes an unreasonable application of *Strickland* to the facts of his case. Thus, the applicable standard of review here is established in § 2254(d)(1), which permits federal habeas corpus relief where a state court decision is "an unreasonable application of ... clearly established

**21.** While chapter 154 of title 28 includes a special exhaustion provision for habeas petitions brought by prisoners in state custody subject to a capital sentence, *see* 28 U.S.C. § 2264; *see generally* 28 U.S.C. § 2261, *et seq.,* this chapter is inapplicable given that Virginia is not an "opt-in" state, pursuant to § 2261. *See Cardwell v. Netherland,* No: 1:96cv1516 (Order dated October 23, 1996); *see also Satcher v. Netherland,* 944 F.Supp. 1222 (E.D.Va.(Richmond)1996). Accordingly, § 2254 provides the exhaustion requirements that govern the instant petition.

**22.** Virginia Code § 8.01–654.1 provides, in relevant part, that

[n]o petition for a writ of habeas corpus filed by a prisoner held under a sentence of death shall be considered **unless it is filed within sixty days** after the earliest of: (i) a denial by the United States Supreme Court of a petition for a writ of certiorari to the judgment of the Supreme Court of Virginia on direct appeal....

(emphasis added). The United States Supreme Court denied Cardwell's petition for certiorari on his direct appeal by Order dated May 1, 1995. *See* 514 U.S. 1097, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995). Thus, Cardwell is time barred from filing future habeas petitions in state courts.

**23.** Specifically, that section provides that

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254(d).

Federal law, as determined by the Supreme Court of the United States." [24]

■ Courts have adopted two different interpretations of the standard of review required by the "unreasonable application" clause of (d)(1), namely, *de novo* review [25] or a more deferential "reasonableness" review.[26] The latter interpretation of the standard of review is persuasive given the plain meaning and purpose of the statute. Section 2254(d)(1) authorizes federal habeas relief where a state court's application of facts to clearly established federal law is "unreasonable." Thus, it is pellucidly clear that the relevant question under the "unreasonable application" clause is whether a state court's application of law to facts was "reasonable." Moreover, this interpretation is consistent with § 2254(d)(1)'s underlying purpose, namely, to ensure that "the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions." *Lindh v. Murphy,* 96 F.3d 856, 867–74 (7th Cir.1996) (en banc), *rev'd on other grounds,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Accordingly, the Supreme Court of Virginia's denial

of Cardwell's ineffective assistance claims must not be disturbed unless this decision is unreasonable.[27]

Indeed, Cardwell does not dispute that the "reasonableness" standard of review is appropriate pursuant to § 2254(d)(1). Rather, Cardwell contends that § 2254(d) does not apply to any of his claims given that there was no adjudication on the merits of these claims in the Supreme Court of Virginia.[28] In support, Cardwell relies on the facts (i) that there was no oral argument or evidentiary hearing with respect to his state habeas petition, and (ii) that his state habeas petition was denied in a two sentence order.[29] Thus, by Cardwell's lights, a review of the state habeas decision for "reasonableness" would require the reviewing court to engage in rank speculation with respect to the basis of that decision. Accordingly, Cardwell contends that the review of his claims denied in the state court proceeding must be *de novo.*[30]

This contention is unpersuasive. Section (d)(1) applies to any claim adjudicated on the merits in state court. The summary order of the Supreme Court of Virginia articulates

**24.** Section 2254(d)(1) also permits federal habeas relief where a state court adjudication of a claim is "contrary to ... clearly established Federal law...." Cardwell does not contend that the Supreme Court of Virginia did not apply *Strickland,* but rather that the Supreme Court of Virginia's application of *Strickland* to the facts of his case was erroneous.

**25.** *See Buehl v. Vaughn,* 1996 WL 752959, at *7 (E.D.Pa. Dec. 31, 1996); *see generally,* Note, *Rewriting the Great Writ: Standards of Review for Habeas Corpus Under the New 28 U.S.C. § 2254,* 110 Harv. L. Rev. 1868, 1973–74 (1997) (discussing different interpretations of § 2254(d), as amended).

**26.** *See Lindh v. Murphy,* 96 F.3d 856, 867–874 (7th Cir.1996)(en banc), *rev'd on other grounds,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see also Perez v. Marshall,* 946 F.Supp. 1521, 1533 (S.D.Cal.1996). In *Lindh,* the Seventh Circuit sitting *en banc* concluded that (d)(1) established two standards of review, namely a "respectful" *de novo* review of legal issues, addressed by the "contrary to" clause of (d)(1), and a "reasonableness" review of mixed issues of law and fact, addressed by the "unreasonable application" clause of (d)(1). *Lindh,* 96 F.3d at 868–69. Given that Cardwell's petition relies on an "unreasonable application" of *Strickland,* the appropriate standard of review

under *Lindh* would be a "reasonableness" review. *Id.* at 870–71.

**27.** In *Lindh,* the Seventh Circuit defines a "reasonable" decision as "a responsible, thoughtful answer reached after a full opportunity to litigate." *Id.* at 871.

**28.** Section 2254(d) provides that its standard of review applies to decisions of a state court on "any claim that was adjudicated on the merits in State court proceedings...."

**29.** The Order denying Cardwell's state habeas petition stated only:

Applying the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), to petitioner's allegation III, and finding no merit in other complaints raised by petitioner, the Court is of opinion that the writ of habeas corpus should not issue as prayed for. It is therefore ordered that the said petition be dismissed.

**30.** *See generally Hall v. Washington,* 106 F.3d 742, 748–50 (7th Cir.1997)(*dismissing summary* conclusion of state court and reviewing record *de novo* ); *United States ex rel. Gooch v. McVicar,* 953 F.Supp. 1001 (N.D.Ill.1997)(relying on state court's explanation of its application of federal law for determination that the state court's application was wrong).

that one claim, claim III, was rejected as procedurally defaulted,[31] and that the court found "no merit in other complaints raised by petitioner." The "other complaints" raised in Cardwell's state habeas petition included several ineffective assistance claims, including the claims raised in the instant petition, and a prosecutorial misconduct claim. These claims were fully briefed by Cardwell and the Commonwealth, and the Supreme Court of Virginia specifically stated in its summary order that the remaining claims had "no merit." Thus, the order, while brief, compels the conclusion that the Supreme Court of Virginia analyzed Cardwell's ineffective assistance claims under *Strickland* and found that these claims failed *Strickland*'s two-part test.[32] Accordingly, Cardwell's *Strickland* claims were adjudicated on the merits in state court, and (d)(1) applies.

Of course, where, as here, there was no opinion disclosing the Supreme Court of Virginia's application of federal law to the facts of the case, the practical significance of (d)(1)'s deferential standard of review is lessened. A federal district court is required to review a state court's application of federal law for "reasonableness." But where, as here, that application is not explicated in argument or opinion, such a review is not possible. It would be mere speculation to assume that the state court adopted all or any of the Commonwealth's arguments in denying the claims in Cardwell's petition. For example, the Supreme Court of Virginia could have determined that Cardwell's ineffective assistance claims failed either because trial counsel's performance was reasonable, or because no prejudice resulted from any

errors. Where, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record. Should the federal court conclude that the applicant has stated a viable claim under clearly established United States Supreme Court precedent, then this conclusion is strong evidence that the state court's summary decision was "unreasonable." [33] Thus, on the facts of this case, the distinction between *de novo* review and "reasonableness" review becomes less significant.

## V.

Cardwell asserts that his conviction and sentence is fatally infected with five constitutional infirmities falling into two categories. Specifically, Cardwell asserts (i) ineffective assistance of counsel, alleging three instances of unreasonable failures by trial counsel, and (ii) denial of due process, alleging two constitutional errors in his sentencing. The Commonwealth moves to dismiss the § 2254 petition, contending that none of Cardwell's claims are an appropriate basis for relief.

### A. *Ineffective Assistance of Counsel*

Cardwell contends that he was denied the effective assistance of counsel guaranteed by the Constitution because (i) trial counsel's performance fell below an objective standard of reasonableness, and because (ii) there is a reasonable probability that, but for trial counsel's unreasonable performance, he would not have been convicted or, in the alternative, would not have received the death penalty. *See Bell,* 72 F.3d at 427 (citing *Strickland,* 466 U.S. at 688, 694, 104

---

**31.** The Supreme Court of Virginia referred to *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). In this case, the Supreme Court of Virginia concluded that petitioners have no standing to raise claims in state habeas proceedings that could have been, but were not, raised and adjudicated at trial and direct appeal. *Id.* 205 S.E.2d at 682.

**32.** *See Wainwright v. Witt,* 469 U.S. 412, 421, 105 S.Ct. 844, 850–51, 83 L.Ed.2d 841 (1985) (federal courts should presume that state court applied correct legal standard unless affirmative evidence to the contrary); *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997) (holding that "per-

functory" state court rulings are nonetheless evaluated pursuant to § 2254(d) for "reasonableness").

**33.** *See generally Lindh,* 96 F.3d at 871 ("By posing the question whether the state court's treatment was 'unreasonable,' § 2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject."). *But see Hennon,* 109 F.3d at 335 (describing *Lindh* as "realism", but holding that a state court decision is reasonable where it is "minimally consistent with the facts and circumstances" notwithstanding a state court's "deficient" discussion of its reasoning).

S.Ct. at 2064–65, 2068). Specifically, Cardwell asserts three errors of trial counsel that meet this standard. Each is separately addressed.

### 1. Trial Counsel's Failure to Present Mental Health Evidence

Cardwell's first claim regarding the performance of his counsel concerns trial counsel's failure to present mental health evidence in mitigation of punishment at the sentencing phase of the trial.

Trial counsel Geary was appointed on May 20, 1993, and co-counsel McGarvey was appointed in June 1993. While mental health experts were apparently contacted as early as mid–June 1993, it is undisputed that trial counsel did not locate an expert willing to evaluate Cardwell until August, approximately one month before the September 7 trial date. Moreover, on August 3, when Dr. Thomas, the mental health expert selected by Cardwell's counsel was appointed, trial counsel failed to ascertain that Dr. Thomas would be unable to complete his evaluation in time for the trial because of a planned vacation. These errors led to trial counsel's failure to develop mental health evidence for the purposes of mitigation at the sentencing phase. Moreover, trial counsel learned on August 3 that Thomas would be on vacation until August 25 and subsequently learned that Thomas would require one to one and one-half months to prepare an evaluation upon his return, thereby pushing the expected completion of the evaluation well beyond the September 7 trial date. Yet, trial counsel filed no motion for a continuance until August 23. And this notwithstanding the fact that the trial judge, at the granting of a prior continuance, had put counsel on notice that further motions and possible delays should be brought "promptly to the Court's attention."

 Trial counsel's performance fell below the objective standard of reasonableness in light of prevailing professional norms when trial counsel (i) failed to secure the services of a mental health expert in a timely fashion, and (ii) failed to move for a continuance in a timely fashion when counsel's delay jeopardized the ability of the appointed expert to prepare an evaluation in time for trial. An attorney has a duty, in a capital case, to investigate all possible avenues for a defense to or mitigation of an offense.[34] Cardwell's trial counsel, whether through the delay in securing expert assistance or the delay in seeking a continuance, failed to prepare evidence of Cardwell's mental health background, a factor explicitly recognized as a possible mitigating factor in the Virginia death penalty statute.[35] This failure is not absolved by the strong presumption of correctness afforded tactical decisions. *See Baxter,* 45 F.3d at 1513. It is not the product of any tactical decisions. Had counsel developed Cardwell's background and history and chosen not to present such testimony, then this decision would be entitled to some deference. But that is not this case. Trial counsel clearly thought that Cardwell's mental health and history was relevant to his sentencing, hence counsel's efforts, albeit tardy, to obtain a report and a continuance. The failure to acquire such a report in time

---

**34.** *See, e.g., Baxter v. Thomas,* 45 F.3d 1501, 1513 (11th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995); *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987).

**35.** For example, Va. Code Ann. § 19.2–264.4 states, in relevant part, that

> B. In a case of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence.... Evidence which may be admissible ... may include the circumstances surrounding the offense, **the history and background of defendant,** and other facts in mitigation of the offense....

(emphasis added). Moreover, Va. Code Ann. § 19.2–264.3:1 provides for the appointment of mental health experts in death penalty cases for the preparation and presentation of

> information concerning the defendant's history, character, or mental condition, including (i) whether the defendant acted under extreme mental or emotional disturbance at the time of the offense; (ii) whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was significantly impaired at the time of the offense; and (iii) whether there are any other factors in mitigation relating to the history or character of the defendant or the defendant's mental condition at the time of the offense.

for trial is, on the facts of this case, below an objective standard of reasonableness in light of prevailing professional norms. *See Bell,* 72 F.3d at 427.

 But the *Strickland* analysis does not end with this conclusion. Yet to be determined is the issue of prejudice, namely, whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. In this context, the question is whether there is a reasonable probability that Cardwell would have not received the death penalty[36] had trial counsel presented mental health evidence in mitigation of the offense at the sentencing phase of trial.

The Commonwealth sought to prove the existence of two aggravating factors at the capital sentencing phase of trial, namely, (i) the vileness of the crime, and (ii) Cardwell's future dangerousness. The jury's sentence of death was based on its finding that the offense was outrageously and wantonly vile and that death was therefore warranted notwithstanding consideration of the evidence in mitigation. The jury's sentence of death was not based on "future dangerousness." Accordingly, to satisfy the prejudice prong of *Strickland,* Cardwell must show a "reasonable probability" that the presentation of mental health evidence at the sentencing phase of trial would have either (i) rebutted the vileness of the murder of Brown, or (ii) mitigated the capital offenses sufficient to convince the jury that the death sentence was inappropriate notwithstanding the vileness of Cardwell's crimes.

Cardwell has now had the opportunity to expand the record by introducing expert mental health reports from Drs. Hagan and Hart that forecast the evidence that would have been presented to the jury in the sentencing phase of Cardwell's trial, had trial counsel investigated Cardwell's mental health and background in a timely fashion. In light

of the proffers and conclusions in these expert reports, there is no reasonable probability that the jury would have spared Cardwell from the death penalty on the "vileness" factor had this evidence been presented at trial. The report by Dr. Hagan, a clinical psychologist, concludes that the absence of mental health testimony "may have ... deprived [the jury] of the contextual framework of the offense," impairing the jury's exercise of its sentencing discretion. Yet, Hagan concedes that his report "draws heavily upon future dangerousness and, more importantly, future *non* dangerousness." (emphasis in original). In essence, Hagan contends that mental health evidence would have provided a context for the jury to assess the risk of Cardwell's future dangerousness in the prison environment. Even assuming, *arguendo,* that Hagan's conclusion is correct concerning the importance of mental health evidence to the jury's assessment of future dangerousness, there is no "reasonable probability" that Cardwell's sentence would have been different had such information been presented because the jury recommended a sentence of death on the vileness of the crime, not future dangerousness. Thus, the "context" that Hagan concludes was absent from the jury's deliberation was irrelevant to the jury's sentence of death. Accordingly, trial counsel's failure to present such "context" did not prejudice Cardwell, and cannot form the basis for a *Strickland* claim.

The report by Dr. Hart, a neuropsychologist, concludes that an evaluation of Cardwell indicates brain dysfunction and an undiagnosed nonverbal learning disability, possibly resulting from a childhood concussion combined with years of drug and alcohol abuse. As a result of such dysfunction and disability, Hart concludes that Cardwell would likely have experienced:

(1) negative feedback from others as a result of his learning disability;

(2) poor self-esteem and a lowered sense of competence; and

---

36. Cardwell does not and cannot contend there is a reasonable probability that he would not have been convicted of the murder had the mental health evidence been presented. Even so, the *Strickland* prejudice analysis properly applies to a capital sentencing phase of a trial. *See, e.g., Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068 (prejudice requires reasonable probability that result of proceeding would have been different).

(3) "difficulty accommodating to novel events, adapting to complex situations, and appreciating incongruities and non-verbal cues in social situations."

Hart's testimony, at most, might have influenced the jury's determination of whether Cardwell would be dangerous in the future.[37] For example, Hart seems to suggest that with diagnosis and treatment for substance abuse and the learning disability, the risk of Cardwell's future dangerousness would be reduced. The jury's sentence of death, however, was based on the vile and outrageous manner in which Cardwell murdered Brown. "Vileness" factor is defined as "torture, depravity of mind or aggravated battery to the victim." Va. Code Ann. § 19.2-264.4(c). Cardwell's capital crimes fit squarely within this definition. Brown was robbed, kidnapped, and held at gunpoint while he pled for his life. Deaf to these pleas, Cardwell cut Brown's throat and wrists, and when Brown did not die as a result of these wounds, Cardwell shot Brown twice in the back of the head execution style. Then Cardwell left the body in the woods. Cardwell's behavior clearly amounts to "torture" and "aggravated battery" and his crimes reflect "depravity of mind." Hart's report does not rebut this conclusion. Indeed, there is no logical connection between the unrebutted "vileness" of Cardwell's crimes and the mental health evidence presented by Dr. Hart. Thus, there is no "reasonable probability" that the presentation of mental health evidence such as the report of Dr. Hart would have rebutted the "vileness" of the crime, thereby convincing the jury that Cardwell's

conduct "was not at the core of the statute's contemplation." *Fitzgerald*, 943 F.2d at 470.

To demonstrate prejudice, then, Cardwell must show that there is a "reasonable probability" that the presentation of Dr. Hart's conclusions would have provided evidence in mitigation of Cardwell's offense sufficient to convince a jury that the death sentence was inappropriate, notwithstanding the "vileness" of Brown's murder. Cardwell cites no circuit authority in which a failure to present mental health testimony at a sentencing phase of trial has been found prejudicial. Indeed, the failure to present such evidence has consistently been held to fall short on the second prong of the *Strickland*.[38] Here, too, failure to present the expert mental health evidence in mitigation did not prejudice the sentencing phase of Cardwell's trial.

The jury in this case was aware of Cardwell's drug history and aware, through the testimony of his grandmother, that Cardwell had suffered parental neglect as a child. Nonetheless, the jury found that Brown's murder was wanton and vile in a manner which outweighed the circumstances in mitigation, and sentenced Cardwell to death. There is no "reasonable probability" that this conclusion would have changed had trial counsel presented the jury with the evidence proffered by Dr. Hart. Hart does not address Cardwell's state of mind at the time of Brown's murder, nor does Hart offer any evidence of a lessened culpability in that offense. While Cardwell may well have had a learning disability and difficulty adapting to novel situations, this "mitigating" evidence falls far short of creating a "reasonable

---

**37.** Indeed, even this assumption may be assuming too much. In *Barnes v. Thompson*, 58 F.3d 971 (4th Cir.1995), the petitioner was sentenced to death under the "vileness" prong of Virginia's death penalty statute, and complained of trial counsel's failure to adduce evidence of petitioner's mental impairment in mitigation of the vile nature of his conduct. *Id.* at 980–81. The panel concluded that even had such evidence mitigated the "vileness" of the offense conduct, it might have increased the likelihood that a sentencing body would have found future dangerousness. *Id.* at 981. Accordingly, the panel found no "reasonable probability" that the failure to introduce mitigating evidence of petitioner's mental condition was prejudicial for the purposes of *Strickland*. *Id.*

**38.** *See, e.g., Poyner v. Murray*, 964 F.2d 1404, 1421 (4th Cir.), *cert. denied*, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992) (failure to present evidence of low intelligence did not prejudice sentencing phase); *Fitzgerald v. Thompson*, 943 F.2d 463, 470 (4th Cir.1991), *cert. denied*, 502 U.S. 1112, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992)(testimony from mental health expert and probation officer would not have affected capital sentence based on vileness); *see also Barnes v. Thompson*, 58 F.3d 971, 980–81 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 435, 133 L.Ed.2d 350 (1995)(failure to present evidence of abuse and dysfunction unlikely to satisfy *Strickland* second prong).

probability" that the jury would not have sentenced Cardwell to death based on the "vileness" of Brown's murder had counsel presented mental health testimony at trial.

Accordingly, Cardwell cannot meet the prejudice prong of *Strickland,* and trial counsel's failure to present mental health evidence at trial does not provide a basis for federal habeas relief.

### 2. Trial Counsel's Efforts to Impeach the Testimony of Richard Claiborne

Cardwell's second claim regarding the effectiveness of trial counsel concerns the cross-examination and impeachment of Richard Claiborne.

■■■Claiborne, Cardwell's companion throughout events leading to Anthony Brown's murder, provided damaging testimony at trial of the details of Brown's murder. Cardwell contends that Claiborne's testimony was self-serving, given that only the "triggerman" can˚be convicted of capital murder in Virginia. *See, e.g., Johnson v. Commonwealth,* 220 Va. 146, 255 S.E.2d 525 (1979), *cert. denied,* 454 U.S. 920, 102 S.Ct. 422, 70 L.Ed.2d 231 (1981). Accordingly, Cardwell contends that the impeachment of Claiborne was integral to an effective defense. By Cardwell's lights, trial counsel's cross-examination of Claiborne constitutes ineffective assistance of counsel because trial counsel (i) failed to cross-examine Claiborne sufficiently on the question whether promises were made in exchange for testimony; (ii) failed to impeach Claiborne with a prior statement made to police; and (iii) failed to impeach Claiborne with documentary evidence concerning gun purchases.

The Supreme Court, in *Strickland,* articulated a highly deferential standard for reviewing the reasonableness of a counsel's performance, recognizing the inherent difficulties in evaluating a performance through the "distorting effects" of hindsight. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

Specifically, the Supreme Court instructed courts to "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Id.* This is especially true with respect to tactical decisions made by counsel at trial,[39] such as the handling of witnesses,[40] which are especially vulnerable to criticism when removed from the context of a hotly contested litigation.

■■■ These principles, applied here, compel the conclusion that trial counsel's handling of Claiborne was not below an objective standard of reasonableness in light of prevailing professional norms. Trial counsel thoroughly cross-examined Claiborne with respect to both his credibility and his motivation for testifying in Cardwell's trial. Claiborne was asked about ways in which he might benefit from testifying against Cardwell, inconsistencies in his statement, his prior record, lies he originally told police, and contradictions in Claiborne's account of gun purchases. While the record clearly reflects that trial counsel touched on each of the issues raised here by Cardwell, Cardwell contends that trial counsel was unreasonable in failing to "follow through" on these lines of questioning using specific documents for more effective impeachment. While Cardwell's federal habeas counsel may well have taken a different approach in the cross-examination of Claiborne, trial counsel's handling of Claiborne is not objectively unreasonable. Where, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective, does not constitute unreasonable performance for the purposes of *Strickland. See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■■■ In the alternative, assuming, *arguendo,* that the cross-examination of Claiborne was objectively unreasonable, Cardwell cannot show prejudice from this error. While Claiborne was the only witness pres-

---

39. *See, e.g., Hutchins v. Garrison,* 724 F.2d 1425, 1436 (4th Cir.1983), *cert. denied,* 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984).

40. *See, e.g., Sallie v. North Carolina,* 587 F.2d 636, 640 (4th Cir.1978), *cert. denied,* 441 U.S.

911, 99 S.Ct. 2009, 60 L.Ed.2d 383 (1979) ("[reasonableness] standard not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness").

ent when Brown was murdered, his testimony was corroborated by Cardwell's own admissions, as related in the testimony of Jones, Coles, and Perotte. Specifically, Jones and Coles testified that Cardwell admitted that he had cut Brown's throat and shot him in the head with Claiborne's gun. Perotte, Cardwell's girlfriend at the time, also testified that Cardwell had admitted on the night of the murder that he, not Claiborne, had killed Brown. Thus, Claiborne's testimony was supported by Cardwell's admissions to friends and associates. Accordingly, assuming that the cross-examination of Claiborne was unreasonable, there is no "reasonable probability" that Cardwell would have been acquitted had trial counsel cross-examined Claiborne as Cardwell, in hindsight, now suggests.

In sum, trial counsel's cross-examination of Claiborne did not fall below an objective standard of reasonableness, nor did this examination prejudice Cardwell. Accordingly, this claim fails to provide a basis for federal habeas relief.

### 3. Trial Counsel's Failure to Present Expert Mental Health or Forensic Evidence at the Time of the Final Sentencing

 Cardwell's third and final claim regarding ineffective assistance of counsel concerns trial counsel's failure to develop the evidence of Cardwell's mental health history and background for the purposes of the trial judge's mandatory review of a jury's recommendation of a sentence of death. See Va. Code Ann. § 19.2–264.5.[41]

Counsel had two months between the September 9 sentencing phase at trial and the November 10 post-sentencing review of the sentence of death by the trial judge. Yet, trial counsel did not prepare and present

Cardwell's mental health evaluation for the purposes of that review. Indeed, the trial judge noted the absence of mental health history that had been the basis for Cardwell's motion for a continuance, stating

[w]e are now two months since the trial date, and apparently there's still no evidence from this doctor from MCV. I think we just want to note for the record that he's had an additional two months and we still don't have any evidence.

Trial counsel contends that the failure to submit evidence from Dr. Thomas in the sentence review proceeding was a tactical decision, intended to preserve an issue for appeal with respect to the trial judge's denial of a continuance.[42]

Assuming, arguendo, that trial counsel was unreasonable is failing to prepare and present expert mental health evidence at the trial court's sentencing review, this error was not prejudicial for the purposes of Strickland. As discussed, supra, the mental health evidence now proffered by Cardwell, does not create a "reasonable probability" that a jury would have sentenced Cardwell to life imprisonment on the capital convictions had the mental health evidence been presented. For the same reasons previously elaborated, this evidence also does not create a "reasonable probability" that the trial judge would have set aside the jury's recommended sentence, for good cause shown, had the mental health evidence been presented.

In sum, Cardwell's three contentions regarding ineffective assistance of counsel fail to meet the two-prong test articulated by Strickland for ineffective assistance claims. Thus, the conclusion reached by the Supreme Court of Virginia that Cardwell's ineffective assistance claims had no merit was reason-

---

**41.** In Virginia, after a jury recommends a sentence of death, a trial judge is required to direct an investigation of the defendant to determine if the death sentence is appropriate. See Va. Code Ann. § 19.2–264.5. For good cause shown, a trial judge may set aside the sentence of death and impose a sentence of life in prison. Id.

**42.** Specifically, trial counsel McGarvey, by affidavit, states that

[a]fter the trial court denied my repeated motions for a continuance, I made a strategic

decision not to continue with the evaluation by Dr. Thomas. Based on my experience, I did not believe that the trial judge would have overturned the jury's sentencing decision on Dr. Thomas's findings. Had I continued with the evaluations, and submitted the information to the court at the final sentencing, I ran the real risk that the trial court would have found that the information would not have made a difference, thereby undercutting my claim when I took the issue up on appeal.

able.[43] Accordingly, Cardwell's ineffective assistance claims provide no basis for federal habeas relief.

### B. *Violations of Due Process and the Protection Against Cruel and Unusual Punishment* [44]

#### 1. *The "Vileness" Aggravating Factor*

Cardwell claims that the Virginia statutory scheme for imposing the death penalty denies his constitutional right to due process and to be free from cruel and unusual punishment. Specifically, Cardwell contends (i) that the inclusion of "vileness" as an aggravating factor renders the Virginia statutory scheme unconstitutionally vague, and (ii) that the standard jury instruction for "vileness" does not guide the jury's discretion.

As a threshold issue, the Commonwealth contends that Cardwell cannot raise this claim in his federal habeas proceeding because it was never presented to the Supreme Court of Virginia. And with respect to this threshold procedural issue, Cardwell's two challenges to the · "vileness" prong of the statutory scheme stand on different footings.

Cardwell's second assignment of error on direct appeal stated:

> The trial court erred in denying defendant's Motion that the Virginia Death Penalty statutory scheme is unconstitutional in that it fails to guide the jury's discretion.

He contends that this assignment effectively appealed his constitutional "vagueness" challenges to both the Virginia statutory scheme and the jury instruction used in his case. With respect to his due process challenge to Virginia's statutory scheme on the basis of the "vagueness" of the "vileness" factor, Cardwell has properly preserved this issue for federal habeas review. Cardwell's assignment of error on direct appeal challenged the failure of Virginia's statutory scheme to "guide the jury's discretion" with

respect to the sentence of death. In its decision on Cardwell's appeal, the Supreme Court of Virginia rejected this challenge in a portion of the Supreme Court of Virginia's opinion titled "pretrial matters." *See Cardwell*, 450 S.E.2d at 150 (citing authority). And before trial, Cardwell had raised an objection to the Virginia statutory scheme for imposing the death penalty, in part, on the basis of the vague nature of the "vileness" factor. Given that this claim was raised and rejected on direct appeal, it is preserved for consideration in the federal habeas petition.

 In contrast, Cardwell has not properly preserved his claim for federal habeas review with respect to the challenge to the jury instruction on "vileness". On direct appeal, Cardwell challenged a jury instruction from the penalty phase of his trial on the basis that the instruction did not inform the jury that it could impose life in prison even where an aggravating factor is found. *See Cardwell*, 450 S.E.2d at 154. Cardwell did not raise a specific objection to the "vileness" instruction on direct appeal and, thus, cannot raise this issue here. *See Duncan v. Henry*, 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Gray v. Netherland*, 99 F.3d 158, 162 (4th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1102, 137 L.Ed.2d 234 (1997).

 Turning to the merits of Cardwell's claims, Cardwell's challenge to the Virginia statutory scheme concerning the vague nature of the "vileness" factor provides no basis for habeas relief. The Fourth Circuit has consistently sustained the validity of the "vileness" factor in Virginia against vagueness challenges. *See, e.g., Barnes v. Jabe*, 71 F.3d 495, 496 (4th Cir.1995) (citing authority). Accordingly, the "vileness" factor is not unconstitutionally vague and its application in Cardwell's case does not amount to a constitutional violation. Moreover, even were Cardwell's objection to the jury instruction preserved, it would not form the basis

---

**43.** Indeed, were *de novo* review of Cardwell's ineffective assistance claims appropriate, the state court decision would be correct.

**44.** Cardwell concedes, with respect to both of his due process and Eighth Amendment claims that he is not entitled to federal habeas relief on the basis of these claims under controlling case law.

*See* Initial Petition for a Writ of Habeas Corpus, at 24–25, n. 22, 23 (March 17, 1997). Cardwell raises these claims to "preserve each claim for possible future reference and relief *if* controlling law should change and be deemed applicable to the Petitioner's case." *Id.*

for federal habeas relief. The jury instruction tracked the precise statutory language with respect to the "vileness" aggravating factor, language that uniformly has been sustained against constitutional "vagueness" challenges. *See Barnes,* 71 F.3d at 496. Thus, to the degree that Cardwell's challenge to the "vileness" factor in capital cases is preserved, it is foreclosed by controlling authority in this circuit.

### 2. Meaningful and Rational Review of the Sentence of Death on Direct Appeal, Pursuant to Va. Code Ann. § 17–110.1.

Cardwell's final contention challenges the Virginia statutory death penalty scheme, contending that the scheme does not provide meaningful and rational review of a sentence of death. Specifically, Cardwell contends that, in reviewing a sentence of death, the Supreme Court of Virginia (i) does not consider mitigating circumstances, (ii) invariably concludes that the jury was entitled to find that the sentence of death is appropriate, and (iii) never concludes that a finding of an aggravating factor is erroneous.

 This claim was raised in Cardwell's state habeas proceeding as "allegation III" and was explicitly denied as barred by the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974). In *Slayton,* the Supreme Court of Virginia concluded that a petitioner has no standing to raise claims in state habeas proceedings that could have been, but were not, raised and adjudicated at trial and direct appeal. *Id.* 205 S.E.2d at 682. Thus, the Supreme Court of Virginia concluded that Cardwell's challenge to the review of his death sentence was procedurally barred. Where a habeas petitioner defaults a federal claim in state court pursuant to a state procedural rule, federal review of the defaulted claim is barred. *Spencer v. Murray,* 18 F.3d 229, 232 (4th Cir.1994).[45] Accordingly, Cardwell's challenge to the Virginia statutory scheme on the grounds that

the scheme provides no meaningful review cannot form the basis for federal habeas relief.

 In the alternative, even were Cardwell's claim not procedurally barred, it nonetheless provides no basis for federal habeas relief. The Supreme Court of Virginia conducted a separate review of Cardwell's death sentence, as required by Va. Code Ann. § 17.110.1. *See Cardwell,* 450 S.E.2d at 155. As a result, the Supreme Court of Virginia concluded that Cardwell's sentence of death was (i) not excessive, and (ii) not disproportionate to penalties imposed by other sentencing bodies in Virginia. *Id.* at 156. Accordingly, Cardwell received a review of his sentence as mandated by the Virginia statutory scheme. Controlling authority in this circuit has sustained the constitutionality of Virginia's statutory scheme for review of a death sentence. *See, e.g. Buchanan v. Angelone,* 103 F.3d 344, 351 (4th Cir.1996), *cert. granted in part,* —— U.S. ——, 117 S.Ct. 1551, 137 L.Ed.2d 700 (1997). Accordingly, even if Cardwell were not procedurally barred from challenging the constitutionality of the review of his sentence of death, this challenge would provide no basis for federal habeas relief.

### VI.

Cardwell's petition provides no basis for federal habeas relief. Thus, the Commonwealth's motion to dismiss the petition is granted and Cardwell's petition is dismissed. Accordingly, the stay of execution entered by Order dated October 23, 1996 is vacated.

An appropriate order will enter.

---

**45.** The two exceptions to this bar, prior to the recent federal habeas amendments, were for cases of (i) cause for the default and actual prejudice to the rights of a petitioner, or (ii) where a fundamental miscarriage of justice would occur under the "actual innocence" test. *See Spencer,* 18 F.3d at 232 (citations omitted).

Cardwell does not assert that these exceptions are applicable to his claim. Accordingly, the question whether the exceptions noted in *Spencer* are still applicable subsequent to the recent federal habeas amendments is immaterial and is not considered.